### UNITED STATES

v.

**Senior Airman Jose F.S. SIMOY, FR586–68–6218 United States Air Force.**

**ACM 30496.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 22 July 1993.

Decided 8 Nov. 1996

598

Appellate Counsel for Appellant: Major Del Grissom (argued), Colonel Jay L. Cohen, and Lieutenant Colonel Charles L. Carpenter, Jr.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise (argued) and Major R. Scott Howard (argued).

Before En Banc, DIXON, HEIMBURG, PEARSON, SCHREIER, GAMBOA, MORGAN, STARR, and SENANDER Appellate Military Judges.

### OPINION OF THE COURT

PEARSON, Senior Judge:

Today we affirm Senior Airman Jose F.S. Simoy's death sentence for the felony murder of Sergeant Stacy E. LeVay, a policeman who was bludgeoned to death on his birthday during an armed robbery that Simoy masterminded.

## I. FACTUAL BACKGROUND

### A. The Offenses

Appellant and Sergeant LeVay, a newly-wed, worked as law enforcement security policemen on Andersen Air Force Base, Guam. As part of their normal police duties, both escorted commissary employees to the bank for night deposits of large sums. Both also participated in training exercises involving mock robberies of employees making night deposits. However, appellant applied his police skills to commit crime instead of combatting it, ultimately murdering Sergeant LeVay in the process.

In December 1991, appellant hatched a plan to ambush a commissary worker, Ms. Armour, as she made her night deposit. He recruited his brother, Dennis; a friend of Dennis, Che Wolford; two Filipinos nicknamed Nito and Tickboy; and Jesus Ramos, who later dropped out of the plot, to help him.

Appellant began preparations by driving his brother and Che Wolford to the base to case the layout. Appellant told them that two of the gang would have to take care of the security police escort while the other two took care of the "girl." Appellant told Wolford to bring his semi-automatic rifle since he would have to "point the gun to the security officer and tell him to freeze and that somebody will knock him in the head." Concerned about potential noise from a gunshot since the security police office was nearby, Wolford asked, "[W]hat if either of us had to shoot, the security police or me? Would anybody hear it in the office?" Appellant replied, "[N]ot to worry because there's two doors and they won't hear no sound."

Later, on a separate trip, appellant drove Ramos on base to scout the job. When Ramos expressed misgivings about the difficulty of a robbery on base, appellant reassured him, saying, "[I]t's easy because when [I] was on duty, [I] also escorted the lady that was carrying the money." Ramos also recalled that appellant diagramed the robbery in the moisture on the table at his brother's house. Appellant directed where everyone would take positions, including the "two people" who would take care of the "police." Appellant appointed himself to drive the getaway car and told Ramos to bring a pistol.

On Christmas Eve, appellant decided to make the hit because he expected a large cash haul due to holiday shopping. Even though he couldn't locate Nito and Tickboy, and Wolford wanted to attend a party, he continued with his plan using only Ramos

and his brother, Dennis. He reminded Ramos that someone would have to hit the police escort in the head with a pipe to render him unconscious. However, the gang arrived too late to do the job. Appellant tried again four days later but did not see a commissary employee make a deposit.

Finally, on December 29th, appellant's plan jelled. Appellant loaded his sister's car with Wolford's rifle, two lead pipes, a rock, and the other gang members except Ramos. They staked out the commissary, and the appellant pointed out Ms. Armour's car. Appellant assigned everyone's position and duties, once again leaving himself to drive the getaway car. Appellant told Wolford, "Che, you point the gun to the officer. Make sure he raises up his hands and gets down on his knees and Dennis will knock him out." Wolford questioned appellant, "Jose, what if the guy dies?" Apparently unmoved by this prospect, appellant replied, "If the guy dies, he dies."

Appellant then moved the car to a parking area across from the commissary and bought two six packs of beer and some chips. While waiting, either Tickboy or Nito suggested from the back seat, "[W]e'll have to kill them all so that they won't talk." At that remark, appellant stopped talking, glanced back but didn't say anything, and then resumed chatting with Wolford.

As soon as the police escort arrived at the commissary, the gang moved into their positions outside the bank—Tickboy and Nito were to handle the commissary employee in the lead and Wolford and Dennis Simoy were directed to "take out" the security police escort who followed. Wolford "pulled out [his] gun" and yelled "freeze." The security policeman, Sergeant LeVay, turned around and grabbed the rifle. As Sergeant LeVay and Wolford struggled over the rifle, Dennis Simoy came out and "pounded him" with the pipe. As Wolford later recalled, he heard a "cracking sound" about five times as Dennis Simoy beat Sergeant LeVay with the pipe.

Either Nito or Tickboy grabbed the deposit bag from Ms. Armour while the other one punched her in the stomach, causing her to fall to the ground. Ms. Armour also heard a sound as Dennis Simoy beat Sergeant Le-Vay, likening it to the familiar sound of "breaking coconut."

While Dennis Simoy was beating Sergeant LeVay to death, Wolford joined Nito and Tickboy in the getaway car with appellant, and they started to leave. Realizing they were about to leave Dennis behind, appellant backed up to get his brother who, having finished with Sergeant LeVay, was running to the car. The group then noticed another person had driven up and was checking some papers in his car. Wolford asked appellant, "Jose, there's a guy in a car. Do we have to kill him?" Appellant replied twice, "Yeah, kill him." Wolford recalled, "Then [appellant] said something in Filipino to the guy in the front. The guy in the front passed the knife to the guy in the back. The guy in the back got out and stabbed him." Technical Sergeant Donald P. Marquardt, who had decided to work some "overtime" on a Sunday, found himself covered in blood "with a sucking chest wound." In fact, the Filipino attacker stabbed Sergeant Marquardt in the chest, collapsing his left lung, and slashed his neck from the left side clear across to the right side, cutting the anterior jugular veins. According to the treating physician, the slash was "just millimeters away from being all the way through the trachea."

Based on appellant's previous instructions, Dennis Simoy stripped Sergeant LeVay of his radio and pistol and ran to the car carrying those items and the pipe. Appellant rammed the back fence of the base and sped away. Once safely away, appellant burned his sister's car to destroy the evidence and split the cash haul of about $34,145 among the gang. To set up an alibi, he had them drop him off at a local cockfight from which he falsely reported to the local police that someone had stolen his sister's car.

The next day, appellant's father, Felix Simoy, gave a package containing $9000 in cash to a friend for safekeeping. Felix Simoy called the friend later in the day and said appellant would pick up the money, which he did. Appellant then went into hiding and tried to make arrangements to flee the island. He met Rully Padios at an air freight company and told him about the robbery and

subsequent burning of his sister's car to destroy the evidence. He also told Padios "that a vehicle came behind them and he told the person to stab the guy behind—the driver of the vehicle." Appellant boasted to Padios that either Nito or Tickboy was a "nine/ten winner," which meant a known murderer of fearsome reputation.

Appellant eluded capture until January 16, 1992, when FBI and Air Force criminal investigators found him hiding in a bedroom closet at a local civilian's house. While being handcuffed, appellant blurted out to one of the investigators, "Rick [Air Force Office of Special Investigations Special Agent Bergeron], man I'm sorry, but I was railroaded into doing it and I was looking for the other four guys."

Initially, appellant agreed to talk to the FBI investigators and attempted to portray himself as an unwitting accomplice. He claimed he went to the base to check his mailbox at the post office. While there, he ran into three friends who asked for a ride to the cockfights. When he drove around behind the post office to pick them up, he saw the three friends and another person struggling with a security policeman. The four then ran to his car and got in. As he started to leave, one of them shouted, "Stop." When he stopped the car, the individual got out of the car and did "something" to a person who had just driven up and parked.

### B. The Trial

After a two-week trial, court members convicted appellant of conspiring with Dennis Simoy and the others to rob Ms. Armour; robbing her of $74,000 in cash, food stamps, and checks; murdering Sergeant LeVay during the robbery (felony murder); robbing Sergeant LeVay of his pistol and radio; attempting to murder Sergeant Marquardt during the robbery; and deserting from his organization until apprehended. Articles 81, 122, 118(4), 122, 80, and 85, UCMJ, 10 U.S.C. §§ 881, 922, 918(4), 922, 880, and 885.

During sentencing, the members unanimously found, beyond a reasonable doubt, that two aggravating factors existed in appellant's case to warrant the death penalty: (1) the felony murder was committed in such a

way or under circumstances that the lives of persons other than the victim were unlawfully and substantially endangered, and (2) appellant was a principal whose participation in the robbery was major and he manifested a reckless indifference for human life. R.C.M. 1004(c)(4), (8). The members sentenced appellant to death, total forfeiture of pay and allowances, and reduction to E–1, which the convening authority approved.

The felony murder was service-connected because it occurred on base and the victim was an active duty military member. *See Loving v. United States,* — U.S. —, —, 116 S.Ct. 1737, 1751, 135 L.Ed.2d 36 (1996) (Stevens, J., concurring); *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

### C. The Appeal

We heard oral argument in this case on July 2, 1996. Appellant alleges 53 errors geared to overturn his death sentence. (*See* list of asserted issues in the Appendix.) Many of the allegations concern issues which the United States Supreme Court recently laid to rest in *Loving v. United States,* — U.S. —, —, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), as did the United States Court of Appeals for the Armed Forces in *United States v. Curtis,* 44 M.J. 106 (1996). In both cases, the courts upheld the military capital sentencing scheme for murder and felony murder against constitutional attack.

Rather than belabor 53 issues, almost all of which our superior courts have already answered, we address in detail the five areas unique to the trial of this case: ineffective assistance of counsel (Issues I and XXIII); flawed pretrial investigation (Issue III); exclusion of defense sentencing evidence concerning Dennis Simoy's trial (Issue VIII); sentencing instructional errors (Issues XXXVII, XXXVIII, and XL); and appropriateness of the sentence (Issue L). We answer the remaining issues in a summary section at the end of our opinion.

### II. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Today, a convicted military defendant rarely passes on an opportunity to lay the

blame for his predicament at his lawyer's doorstep—this case is no different. What is unique here, though, is that appellant's two military lawyers, Major Bernard E. Doyle, Jr., and Captain James K. Bemis, agree in post-trial affidavits that they and appellant's retained civilian attorney, Mr. Howard Trapp, did not represent appellant effectively during the sentencing phase of the trial. Although Mr. Trapp did not submit an affidavit in the case, we conclude the record of trial is sufficient to resolve this issue. *See Curtis,* 44 M.J. at 118 (post-trial hearing not required if record is adequate to resolve issue).

### A. Standard of Review

■ Appellate courts presume a defense counsel is competent until an appellant points out some error in performance which is unreasonable under professional norms. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984). Where more than one attorney represents an accused, the court looks at the combined efforts of the defense team in assessing overall performance. *See United States v. Boone,* 42 M.J. 308 (1995); *United States v. Walker,* 21 U.S.C.M.A. 376, 380, 45 C.M.R. 150, 154, 1972 WL 14145 (1972).

■ A defense counsel has a duty either to make a reasonable investigation of the law and the facts or make a reasonable decision which makes a particular investigation unnecessary. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. However, when examining an appellant's allegation of ineffectiveness, an appellate court will not second-guess defense counsel's tactical decisions with "Monday-morning quarterbacking." *United States v. Sanders,* 37 M.J. 116, 118 (C.M.A.1993); *see also United States v. Morgan,* 37 M.J. 407, 410 (C.M.A.1993); *United States v. Washington,* 42 M.J. 547 (A.F.Ct.Crim.App.1995). Likewise, while the court will consider a defense counsel's opinion of his or her trial performance in determining competency, counsel's opinion does not dictate the court's decision on the issue. *See United States v. Thomas,* 43 M.J. 550, 581 (N.M.Ct.Crim.App. 1995) (court rejects military defense counsel's

claim that he was ineffective at capital sentencing proceeding); *Atkins v. Singletary,* 965 F.2d 952, 959 (11th Cir.1992), *cert. denied,* —— U.S. ——, 115 S.Ct. 2624, 132 L.Ed.2d 865 (1995); *Harris v. Dugger,* 874 F.2d 756, 761 n. 4 (11th Cir.1989).

■ Thus, to obtain relief on an ineffective assistance of counsel claim, an appellant must show: (1) an error in performance so serious that defense counsel was not functioning as the counsel guaranteed an accused by the Sixth Amendment, and (2) counsel's error deprived appellant of a fair trial—that is, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). *See also Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Appellant fails to clear the first hurdle.

### B. The Defense Attorneys

Captain Bemis was the Andersen AFB Area Defense Counsel, an independent military lawyer assigned to represent Air Force members in pretrial investigations, adverse administrative and disciplinary actions, and courts-martial. He became a military lawyer in December 1988, and before that practiced in a civilian community for about one year, handling some misdemeanor criminal cases. He began representing appellant on January 1, 1992.

Major Doyle was a Circuit Defense Counsel, an independent military lawyer assigned to represent Air Force members in the more serious criminal and administrative matters. He became a military lawyer in 1984, and had extensive military justice experience. Before the Simoy case, he had defended or prosecuted 30–40 trials and represented about 200 convicted service members as an appellate defense attorney in Washington, D.C. He joined Captain Bemis in representing appellant in late January 1992.

Mr. Trapp had practiced law on Guam for 32 years. He took over as lead counsel of the defense team representing appellant in late January 1992.

## C. The Defense Sentencing Case

During the defense sentencing case, Mr. Trapp presented two documents but did not call live witnesses. One of the documents discussed appellant's unsuccessful attempts to secure a pretrial agreement. In the other, appellant wrote a 3 1/2 page statement in which he apologized for his actions, explained he did not intend for Sergeant LeVay to die, asked for rehabilitation, and prayed for forgiveness and his life. Mr. Trapp supplemented appellant's written statement by telling the members that appellant was married with three children, and had three brothers, two sisters, and living parents.

As is customary in military practice, the prosecution offered appellant's three military performance reports covering his time in the service and a personal data sheet reflecting appellant's age, marital status, medals, and other personal data. *See* Rule for Courts–Martial (R.C.M.) 1001(b). In particular, the performance reports documented generally good duty performance and described appellant as an intelligent, well-adjusted airman with noteworthy "dual language communication talents."

Mr. Trapp persuaded the military judge to instruct the members to consider the following specific factors in extenuation and mitigation of the offenses: (1) appellant's age, family status, performance reports, medals, apparent acceptance of responsibility, offer to plead guilty, and pretrial confinement; (2) appellant was not the one who actually committed the murder or attempted murder; (3) appellant was not within the immediate presence of the commission of the act or acts causing death; (4) the lack of significant physical injury to Ms. Armour; and (5) the original robbery plan did not include murder.

## D. The Affidavits

In his post-trial affidavit of February 13, 1995, Major Doyle states he worked the pretrial motions and findings portions of the trial, but participated in "most aspects of the defense pretrial preparation, investigation and trial strategy development." Based on his handling of two other capital murder cases after this one, he is "very concerned that Senior Airman Simoy did not receive effective assistance of counsel during his trial." Major Doyle continues, "Although our efforts were sufficient for a non-capital felony court-martial, we failed to perform up to the professional standards **I have since realized** are necessary in the representation of a capital case." (Emphasis added).

Specifically, Major Doyle contends the defense team failed to: (1) conduct an adequate pretrial investigation of appellant's "upbringing and family background"; (2) seek assistance from "investigators with specialized experience in preparing a capital sentencing case" (often called a mitigation specialist); (3) present any evidence in mitigation; (4) develop "a theme" for the sentencing case; and (5) request any special mitigation instructions.

Regarding appellant's background, Major Doyle states he advised Mr. Trapp to hire "a mitigation specialist," but Mr. Trapp rejected that idea in favor of his own "private investigator, a former Guamanian police officer." According to Major Doyle, Mr. Trapp made the final calls on the scope of the investigation and theory of the case at trial, including the decision not to call witnesses during sentencing, a tactic Major Doyle "questioned" Mr. Trapp on during trial. Major Doyle explains they "concluded that it would [be] most effective for Mr. Trapp to focus upon sentencing and to preserve his credibility before the court members by not being active in presenting our case in findings."

Major Doyle contends the defense team decided appellant's "role in the offense was the central matter in extenuation" and his "character, upbringing and family background had little overall importance to the case because he was not the actual murderer, nor did he plan for the crime to include murder." Instead, they chose to emphasize appellant's "minor involvement in the actual murder itself." However, Major Doyle believes they fell short in showing the court members "the character and nature of the accused" as they made their choice of trial strategy without fully investigating that avenue.

In his affidavit of January 25, 1995, Captain Bemis generally echoes Major Doyle's

comments but adds that Major Doyle did question Mr. Trapp about having some of appellant's family testify on his behalf at sentencing. According to Captain Bemis, "Mr. Trapp apparently decided against doing this. My recollection was the reasons for this included his concerns about the quality of the witnesses they would make." Captain Bemis summarizes the defense team's performance as, "While I naturally believe that we made what we believed to be sound tactical decisions at the time in most instances, I **now realize** that the standards required of us a greater effort than we made to not only present extenuation matters, but to present the kind of mitigating evidence required in capital sentencing cases." (Emphasis added).

### E. Appellant's Complaint

Riding on the crest of his two attorneys' post-trial affidavits, appellant claims he was short-changed during the sentencing proceeding. Appellant complains his counsel were almost ineffective *per se* by not retaining a mitigation specialist in a capital case to present a "case for life." Appellant points to a post-trial mitigation specialist's extensive report on his cultural background and upbringing, medical and mental history, and favorable statements from friends and family to show the evidence his counsel could have presented with an adequate pretrial investigation (Issue I). As a side issue, appellant also complains that his counsel should have objected to a photograph of Sergeant LeVay taken in uniform with the American flag in the background (Issue XXIII).

### F. Discussion

■ We admitted the post-trial mitigation specialist's report at appellate defense counsel's request on the ineffective assistance issue. However, we conclude appellant was ably represented, and as the Court of Appeals for the Armed Forces held in *United States v. Loving*, 41 M.J. 213, 250 (1994), a trial defense counsel is not *per se* ineffective by failing to use a mitigation specialist.

While Major Doyle tends to minimize his knowledge of capital case precedent in his affidavit, he displayed a wealth of informa-

tion on that subject at trial. He briefed and argued many of the constitutional and capital case-specific procedural issues appellate defense counsel now argue before us; and on several of those issues, appellate counsel "invite[ed] the Court's attention to the motion and argument of trial defense counsel." (*See* Appendix, Issues II, V, VI, XVIII, XIX, XXX, XXXIV, XXXVIII, XXXIX, XL.) Moreover, before trial, Major Doyle filed a petition for an extraordinary writ with this Court asking us to direct the convening authority to refer this case as noncapital because there was no evidence that appellant personally murdered Sergeant LeVay (he was a "nontriggerman" accused). On June 29, 1992, we denied the petition without prejudice to appellant's right to raise the issue to the trial judge, which Major Doyle did, albeit unsuccessfully.

During voir dire questioning of the court members, Major Doyle once again displayed his keen knowledge of capital case sentencing requirements. During individual questioning of the first court member, he asked:

> Okay. Now, the U.S. Supreme Court has said that the decision on whether society may execute a person for his or her crimes requires the trial court to inquire into the character and record of the individual offender. If Airman Simoy were convicted of the charges, would you be able to fully aspects of him as a person in deciding whether he should be put to death?

Receiving an affirmative response, Major Doyle posed a similar question to the other members.

■ Consequently, we give no weight to either Major Doyle's or Captain Bemis' statement, almost 18 months after the event, that the defense team somehow negligently overlooked the entire "character and nature of the accused." Instead, examining the record of trial and case file from cover to cover, including the post-trial mitigation specialist's report, we are convinced that the defense team made tough tactical choices in this case based on a keen appreciation of constitutional legal precedent and a reasonable trial strategy.

### 1. The Trial Strategy

 First, the defense team adopted a reasonable trial strategy or "theme" of the case which they outlined during the litigated findings portion of the trial—appellant was only an unwary getaway car driver who did not physically harm anyone and became the scapegoat only when his immunized accomplices needed to finger a ringleader to cut deals with the government. The strategy was reasonable because appellant could not plead guilty to capital felony murder or any related offense. Article 45(b), UCMJ, 10 U.S.C. § 845(b); *United States v. Matthews*, 16 M.J. 354, 363 (C.M.A.1983).

Contrary to appellate defense counsel's contention during oral argument, there is no way to know if the members rejected the defense theory when they convicted appellant of felony murder. The elements of that offense only required the members find beyond a reasonable doubt that appellant was a knowing participant in the robbery, not that he engineered and commanded it. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (MCM), Part IV, ¶ 43b(4), c(5) (1984). Thus, it was entirely reasonable for the defense team to continue with their strategy during sentencing, focusing on the two aggravating factors to show death was not warranted because appellant did not endanger anyone— his brother and Wolford did—and he was not a major participant, only the getaway driver.

 Granted, the defense strategy was not successful. However, the success of a criminal defense attorney's trial theory is not the measure of its soundness—if it were, every conviction would have at least one incompetent defense lawyer. Instead, we look at whether counsel made an objectively reasonable choice in strategy from the alternatives available at the time. *United States v. Ingham*, 42 M.J. 218 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996); *United States v. Fluellen*, 40 M.J. 96 (C.M.A.1994).

Here, the three defense attorneys saw the handwriting on the wall before trial that appellant was going to be convicted. After all, appellant submitted several plea bargain offers before trial which the government rejected, and then tried to plead guilty at trial.

Knowing that, counsel used the findings portion of the trial to hammer away at appellant's accomplices, a tack they continued in sentencing. Thus, the defense team tactically focused on the very two aggravating factors which the members had to decide beyond a reasonable doubt before they could adjudge death.

A viable strategy? You bet—the dissenting judges of our Court grab hold and embrace that strategy when voting to overturn appellant's death sentence.

### 2. Minimizing Your Losses

 Second, all three defense counsel well knew that the prosecution could launch a devastating counterattack if they opened the door to appellant's character closet, or tried to blame his problems on alcohol or any perceived mental or intellectual deficiency. Consequently, they had to present a sentencing case which minimized appellant's exposure to rebuttal. In that regard, they successfully won a motion to preclude the prosecution from presenting any evidence, except in rebuttal, that appellant may have committed another robbery off-base. They would have squandered that hard-fought victory by presenting character evidence in sentencing. *See* MIL. R. EVID. 404(a); *United States v. Pruitt*, 43 M.J. 864 (A.F.Ct. Crim.App.1996).

Defense counsel were also aware of the results of a mental examination ("sanity board") of the appellant which they requested before trial under R.C.M. 706. The medical board which examined appellant concluded he was not suffering from a mental disease or defect that impaired his judgment at the time of the crimes and he understood the nature of his acts and the quality of his conduct. The board also diagnosed appellant, in part, as suffering from "Alcohol Abuse, In Remission; Mixed Substance Abuse (THC, Cocaine), In Remission." More importantly, defense counsel were aware of the entire contents of the board's report, not just the board's general conclusions. *See* R.C.M. 706(c)(3).

 Generally, the complete report concerning an accused's mental examination

under R.C.M. 706 is a privileged document for the defense. The government only gets a copy of the board's ultimate conclusions, but not the underlying data. *See* MIL. R. EVID. 302; R.C.M. 706(c)(3) and (5). However, under our evidentiary rules, an accused may waive that privilege by "offering expert testimony concerning" his mental condition. MIL. R. EVID. 302(b)-(c); *United States v. Mansfield*, 38 M.J. 415 (C.M.A.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994). Appellant waived the privilege in this case at the appellate level when he: (1) faulted his attorneys for not presenting expert testimony on his mental state, and (2) offered his own expert's post-trial neuropsychological evaluation which included a personal evaluation at the confinement facility. Consequently, we ordered production of the entire report on appellate government counsel's motion so we could fairly review whether appellant's counsel were deficient in that area. They were not.

In the expanded report, the medical examination board members determined appellant was trying to manipulate the results to make himself appear "intellectually impaired as well as psychiatrically dysfunctional" when he was not. Their belief was borne out by appellant's own post-trial expert who found appellant was of average intelligence "with essentially normal neuropsychological test results."

■■■ Furthermore, in deciding which pretrial investigative avenues to explore, a defense attorney may rely on information the client furnishes. *United States v. Powell*, 40 M.J. 1 (C.M.A.1994); *Mitchell v. Kemp*, 762 F.2d 886 (11th Cir.1985). The expanded report disclosed that appellant described his childhood as "happy" with "loving" parents— hardly the type of tragic childhood background information a criminal defense attorney usually wants pitched to a jury, in the defense case-in-chief or in rebuttal.

Even if defense counsel had elected to package appellant as an abused child with alcohol and mental problems, that alternative does not guarantee success but instead might backfire by convincing court members that appellant was a danger to society. *See Curtis*, 44 M.J. at 121. Here, that danger was especially great, since the prosecution presented records from appellant's personnel file which disclosed he had been disciplined in the past for disorderly conduct and assaulting an individual with a knife.

In determining whether particular evidence might benefit an accused during sentencing, we consider that military courts are "blue ribbon juries" when compared to their civilian counterparts. The average military court member is highly educated and has years of experience either leading or dealing with people. Moreover, by Congressional mandate, military court members are those "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament," qualification criteria not required in civilian criminal jurisprudence. Article 25(d)(2), UCMJ, 10 U.S.C. § 825(d)(2). Thus, military court members are more inclined to follow a trial judge's instructions on the law and vote with their heads instead of their emotions, which does not usually bode well for adult criminals who place the blame for their predicaments on their social environment, parents, alcohol, drugs, or similar excuses not amounting to a legal defense. *See* R.C.M. 916 (defenses).

### 3. Quantity of Evidence v. Quality of Decision ·

Our dissenting Chief Judge faults the defense team for not presenting enough evidence in this, a capital case. Our discussion has focused, instead, on the reasonableness of their trial strategy and the evidence they elected to support that strategy from the alternatives available while minimizing unfavorable rebuttal.

■■■ A defense counsel may tactically choose not to put on any mitigation evidence whatsoever in a capital case and still meet the standard of competence set out in *Strickland*. Strickland's attorney did not seek psychiatric reports on his client or develop or present character evidence—the Supreme Court found Strickland's lawyer competent. Likewise, in *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), Burger's lawyer did not present any mitigation evidence even though the evidence was available—the Supreme Court found Burger's

lawyer competent. Consequently, we do not measure a defense counsel's effectiveness by the quantity of the evidence counsel introduces. Instead, we look at the quality of counsel's decisions, and we find the defense team made a well-thought out tactical choice to limit the defense presentation. *See United States v. Curtis,* 38 M.J. 530, 536–39 (N.M.C.M.R.1993), *aff'd,* 44 M.J. 106 (1996).

For instance, we agree with Mr. Trapp's observation to Major Doyle that appellant's family might not make good witnesses. After all, appellant's brother was a murderer and his father helped stash part of the robbery loot. Appellant also used his sister's car to commit the offenses. Those aspects of the case would appear to put a damper on the effectiveness of family testimony.

### 4. Sergeant LeVay's Photograph

 Counsel likely did not object to Sergeant LeVay's photograph because they knew it was admissible. Each side is entitled to present "certain basic information about the victim of an alleged offense, either for a specific evidentiary purpose such as establishing the victim's identity, size, or apparent physical condition, or to help the court formulate an accurate mental picture of the circumstances of the case." *United States v. Combs,* 35 M.J. 820, 823 (A.F.C.M.R.1992), *aff'd,* 39 M.J. 288 (C.M.A.1994). Photographs of the victim generally fall within that parameter. *United States v. Taylor,* 41 M.J. 701, 705 (A.F.Ct.Crim.App.1995), *aff'd,* 44 M.J. 475 (1996); *Combs.* Here, Sergeant LeVay was killed in the line of duty while in uniform, and his basic training photograph was not inflammatory. *Taylor.* Thus, defense counsel wisely decided to save their ammunition and credibility with the trial judge for the more graphic autopsy photos, and succeeded in excluding two prosecution exhibits.

### G. Conclusion

The defense team ably represented appellant at trial with a viable strategy which was consistent from beginning to end. They tried to prevent the death sentence by contesting it with round after round of pretrial motions where they raised most of the issues now briefed to us on appeal. They started their sentencing case during findings when they doggedly pursued appellant's accomplices, particularly Che Wolford, to show that they cut deals with the government, and thus had the motive to wrongly finger appellant as the ringleader. They made maximum mileage out of the prosecution sentencing evidence, such as appellant's performance reports and medals, and kept out unfavorable information by motion *in limine* or not opening the door to rebuttal. Finally, they tied up their theory for the members with closing argument followed by tailored instructions from the judge on their theory of the extenuation and mitigation case. Had defense counsel presented the very character and mental evidence which appellant now claims they should have presented, we would still be litigating ineffective assistance of counsel, although this time because defense counsel were ineffective by opening the door to prosecution rebuttal.

 It is worth remembering, however, that a military judge is not just a referee at a criminal trial. Instead, the judge must protect the record for the future and clear up uncertainties and loose ends. *See United States v. Ramos,* 42 M.J. 392 (1995). Any military judge presiding today knows that ineffective assistance of counsel is one of the defense flavors of choice on appeal. Thus, when the judge spots a defense tactic that looks out of the ordinary—like not presenting any sentencing evidence—the judge may step in and ask counsel if he or she has a tactical reason for choosing the road less travelled, and whether counsel discussed that option with the accused. Assuming counsel states that a reasonable tactic exists, the judge may get the accused's assent to counsel's choice, and thus nip an ineffectiveness issue in the bud.

## III. ARTICLE 32 INVESTIGATION

### A. Background

Appellant argues the pretrial investigation of his case under Article 32, UCMJ, 10 U.S.C. § 832, was flawed because the investigating officer denied his request for the presence of two government witnesses, Che Wolford and Sergeant Marquardt; or, in the

alternative, a delay in the investigation of about one month until they returned to Guam to testify in Dennis Simoy's Federal trial. The Article 32 investigating officer determined the two witnesses resided more than 100 miles away (Wolford was in prison and Marquardt at a new assignment) and were thus unavailable under R.C.M. 405(g)(1)(A), *Production of witnesses and evidence; alternatives.* The investigating officer then considered their earlier sworn written statements to criminal investigators and made his recommendation to proceed to trial as a capital case.

When appellant renewed the issue at trial, the military judge also interpreted R.C.M. 405(g)(1)(A) as establishing a "bright line" rule of availability based on distance alone and denied appellant's motion for a new investigation. We conclude the investigating officer and judge erred but find the error harmless.

### B. Discussion

■ R.C.M. 405(g)(1)(A) establishes the procedure for producing witnesses at an Article 32 pretrial investigation. In *United States v. Marrie,* 39 M.J. 993 (A.F.C.M.R. 1994), *aff'd,* 43 M.J. 35 (1995), we held this procedural rule did not prohibit the calling of witnesses from beyond the 100–mile limit set forth in it or make them *per se* unavailable. Instead, we concluded the investigating officer must balance the significance of the witness's live testimony against the relative difficulty and expense of obtaining the witness's presence at the hearing. Here, that did not occur.

■ Consequently, the investigating officer and the trial judge were wrong in applying only a distance-driven analysis, particularly when the two witnesses were crucial to the government's proof of a potential **capital case.** However, the error did not prejudice appellant nor did the denial of the continuance which was based on the investigating officer's application of the distance rule. Article 59(a), UCMJ, 10 U.S.C. § 859(a). An accused who wants to preserve the right to the personal attendance of a witness at a pretrial investigative hearing must move to take the witness's testimony

by deposition under R.C.M. 702. *United States v. Chuculate,* 5 M.J. 143, 145–46 (C.M.A.1978); *Marrie,* 39 M.J. at 998.

Defense counsel did not request to depose the two witnesses and appeared to have more than adequate opportunity to interview them before they testified at trial. For example, at one pretrial session counsel told the judge that he was having problems interviewing Che Wolford and Jesus Ramos. The judge informed all parties that the defense would "have that opportunity one way or another," and the very next day asked the defense team if they had an opportunity "to do the sufficient interview of the witnesses they thought were necessary?" Defense counsel replied, "I believe so, your Honor, yes." Likewise, defense counsel also had adequate time to prepare for the pretrial investigation; the investigation was delayed three times at appellant's request, from January 29 to April 7, 1992. Consequently, we find any error was harmless.

### IV. ADMISSIBILITY OF DENNIS SIMOY'S SENTENCE

### A. Background

Dennis Simoy was prosecuted in the United States District Court for the Territory of Guam for robbery and murder and was facing only a mandatory life sentence since the local United States Attorney could not seek the death penalty. Dennis Simoy had already pled guilty and was awaiting sentencing when appellant's trial began.

During a motions hearing, the prosecutor moved *in limine* to preclude appellant from presenting any evidence or comments concerning Dennis Simoy's potential sentence. The prosecutor argued the evidence was not relevant, particularly since appellant and his brother were not "similarly situated." In this regard, the prosecutor pointed out that the death penalty was not available in Dennis Simoy's case because Congress failed to enact a constitutional sentencing scheme to accompany its capital offense statute. 18 U.S.C. § 1111.

Defense counsel conceded that the death penalty was not an option to the United

States Attorney, but countered that Dennis Simoy's sentence was still a relevant mitigation factor since he was the actual killer. Defense counsel pointed out that R.C.M. 1004(b)(3) gave an accused facing a death sentence "broad latitude" in presenting evidence in extenuation and mitigation.

The trial judge granted the prosecutor's motion *in limine*, ruling that Dennis Simoy's sentence was not relevant to appellant's sentencing case. The judge also performed the evidentiary balancing test of MIL. R. EVID. 403 and concluded the evidence would result in a "mini-trial" which would be "misleading and confusing" to the members "far beyond its probative weight."

### B. Discussion

#### 1. Standard of Review

As a general proposition, we review a trial judge's decision to admit or exclude sentencing evidence under an abuse of discretion standard. *United States v. Sullivan*, 42 M.J. 360, 363 (1995) (evidentiary rulings in general); *United States v. Murphy*, 26 M.J. 454, 457 (C.M.A.1988) (sentencing evidence). In performing that review, we recognize a trial judge may even exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. MIL. R. EVID. 403; *United States v. Robertson*, 39 M.J. 211, 215 (C.M.A.1994), *cert. denied*, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 626 (1995).

To reverse for an abuse of discretion requires more than a difference of opinion—we must find the judge's decision was arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987). Where the judge's decision involves a mix of law and fact, we look at the fact-finding under a clearly erroneous standard and the judge's conclusions of law under a *de novo* standard. *Sullivan*, 42 M.J. at 363. We find no abuse of discretion here.

#### 2. Sentence Comparison

The judge did permit defense counsel to cross-examine appellant's accomplices about the plea agreements they had negotiated with the government, including specific jail terms, as it was admissible evidence of potential bias under MIL. R. EVID. 608(c). *See United States v. Colcol*, 16 M.J. 479 (C.M.A.1983). Since Dennis Simoy did not testify at appellant's trial, the trial judge recognized appellant's theory of admissibility for what it really was—sentence comparison, plain and simple.

One accused's acquittal is not relevant to another's conviction, even in trials of co-conspirators. *See, e.g., United States v. Garcia*, 16 M.J. 52 (C.M.A.1983). Likewise, an accomplice's sentence is not a relevant sentencing consideration at an accused's trial, even in a capital case. *See United States v. Hutchinson*, 15 M.J. 1056, 1062–63 (N.M.C.M.R.1983) and cases cited therein, *rev'd on other grounds*, 18 M.J. 281 (C.M.A. 1984) (summary disposition).

Instead, the appropriateness of an accused's sentence is based on the individual circumstances of the case, giving due regard to both the offense and offender. MIL. R. EVID. 401, 402; *United States v. Snodgrass*, 37 M.J. 844 (A.F.C.M.R.1993); *cf. Hatch v. Oklahoma*, 58 F.3d 1447, 1466 (10th Cir.1995) (Constitution does not require sentence comparison between nontriggerman sentenced to death and triggerman sentenced to life), *cert. denied*, —— U.S. ——, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996). If Dennis Simoy had been sentenced to death, would that result have been admissible in appellant's trial to show appellant deserved death? Certainly not! Now, we turn to the "denial of allocution right" twist on the issue.

#### 3. Denial of Allocution Right

We agree that R.C.M. 1004 gives an accused in a capital case "broad latitude" in presenting sentencing evidence. Moreover, military law recognizes the right of an accused to make an unsworn statement, and a trial judge may not lightly restrict that right. R.C.M. 1001(c)(2); *United States v.*

*Provost,* 32 M.J. 98 (C.M.A.1991); *United States v. Rosato,* 32 M.J. 93 (C.M.A.1991).

■ However, we also agree with appellate government counsel that an unsworn statement is not "a vehicle to parade before a court matters that are otherwise inadmissible." Appellee's Reply Brief at 164. For example, an accused may not use a sentencing statement as a vehicle to challenge the court's findings of guilt in a litigated case. *United States v. Teeter,* 16 M.J. 68 (C.M.A. 1983); *United States v. Tobita,* 3 U.S.C.M.A. 267, 12 C.M.R. 23, 1953 WL 2174 (1953).

■ Similarly, an accused may not use a sentencing statement as a vehicle to smuggle in otherwise inadmissible evidence. *United States v. Ezell,* 24 M.J. 690 (A.C.M.R. 1987) (accused could not use unsworn statement to discuss nonconsensual sexual offense victim's past sexual behavior as a prostitute which was inadmissible under MIL. R. EVID. 412); *see also United States v. Fox,* 24 M.J. 110 (C.M.A.1987). We also do not view an accused's right to make a statement in allocution as the right to stand on a soapbox and discuss whatever the accused wants—the statement must be relevant to matters in extenuation, mitigation, or in rebuttal to prosecution evidence. *See* R.C.M. 1001(c)(2)(A); *see generally United States v. Britt,* 44 M.J. 731 (A.F.Ct.Crim.App.1996) (excellent discussion on the origins of the unsworn statement and its historic limitations). Even in a capital case, the military judge has discretion to exclude irrelevant or marginally-relevant sentencing evidence. *Loving,* 41 M.J. at 273.

Consequently, the military judge did not abuse his discretion in precluding appellant from presenting evidence of Dennis Simoy's sentence. We will defer discussing whether appellant has a right to sentence comparison on appeal in the sentence appropriateness section of our opinion.

## V. SENTENCING INSTRUCTIONS

Appellant contends that the military judge erred in instructing the members that: (1) R.C.M. 1004(c)(4), substantially endangering "lives of persons other than the victim," was an "aggravating factor" in his case which would support the imposition of the death penalty (Issue XXXVIII); (2) in deciding whether death was appropriate, the members could consider five "aggravating circumstances" under R.C.M. 1001(1)(b)(4) in addition to the two specific aggravating factors under R.C.M. 1004(c) (Issue XL); and, (3) the members should vote on proposed sentences which included death before voting on proposed sentences which included life (Issue XXXVII).

### A. R.C.M. 1004(c)(4) Aggravating Factor

#### 1. Legal Background of Aggravating Factors

Under Supreme Court precedent, just murdering another human being is not sufficient to warrant the lawful taking of the murderer's life. Instead, the murder must be accompanied by aggravating circumstances (called aggravating factors in military law) which narrow the range of individuals eligible for the death penalty and which reasonably justify that sentence for the accused when compared to others found guilty of murder. Otherwise, the death sentence amounts to cruel and unusual punishment prohibited by the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ Concerning felony murder in particular, the Supreme Court has concluded that the Eighth Amendment prohibits the death penalty for an accused convicted of felony murder who did not kill, attempt to kill, or intend that a killing take place or that lethal force be employed, unless the accused was a major participant in the felony and manifested a reckless indifference to human life. *Compare Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) *with Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). *See also United States v. Curtis,* 32 M.J. 252, 265–66 (C.M.A.1991) (aiding and abetting a felony is sufficient to support felony murder conviction but not death sentence without "active" participation).

For military trials, Congress authorized the death penalty for murders committed during a burglary, sodomy, rape, robbery or

aggravated arson—felony murders. Article 118(4), UCMJ, 10 U.S.C. § 918(4). To comply with Supreme Court guidelines, the President established aggravating factors for military capital trials in R.C.M. 1004(c), including the major participant/reckless indifference aggravating factor for felony murders in R.C.M. 1004(c)(8) which has passed constitutional muster. *Loving,* —— U.S. at ——, 116 S.Ct. at 1751; *United States v. Curtis,* 32 M.J. at 271. With that general framework, we turn to appellant's complaint concerning the second aggravating factor in his case, R.C.M. 1004(c)(4).

### 2. Facts

Over defense objection, the trial judge instructed the members that R.C.M. 1004(c)(4) was an aggravating factor applicable to appellant's case; that is, "the offense was committed in such a way or under circumstances that the lives of persons other than the victim, if any, were unlawfully and substantially endangered." The judge ruled that Sergeant LeVay and Ms. Armour did not qualify as "persons other than the victim" since appellant always intended at a minimum to assault them during the robbery. However, the judge concluded Sergeant Marquardt qualified as an unanticipated victim whose life was unlawfully and substantially endangered through the stabbing. The parties presented closing arguments tailored to the judge's ruling.

Appellant contends "persons" as used in R.C.M. 1004(c)(4) means just what it says—more than one. The government, on the other hand, counters that we should interpret plural to mean singular, and in any event, appellant endangered the lives of other "persons" in the form of security policemen who responded to the scene.

### 3. Discussion

■■■ Plain and unambiguous language in a Rule for Courts–Martial should be applied, not interpreted. *United States v. Leonard,* 21 M.J. 67, 69 (C.M.A.1985). By anyone's reading of the dictionary, "persons" means more than one.

Even if we had to interpret the term, we need look no farther than a companion aggravating factor, R.C.M. 1004(c)(11)(B), which authorizes the death penalty for aiding the enemy or espionage when "in committing the offense, the accused knowingly created a grave risk of death to **a person** other than the individual who was the victim." (Emphasis added). If the drafters meant one person, as opposed to persons, they knew how to say so, and did so two years after this trial by amending R.C.M. 1004(c)(4) to cover endangerment of "one or more persons other than the victim." Executive Order No. 12936, 59 Fed.Reg. 59075 (1994).

■■■ Consequently, the trial judge erred in applying the R.C.M. 1004(c)(4) aggravating factor based on the attack on Sergeant Marquardt alone. However, the judge also erred in restricting the factor to only unanticipated victims of the entire criminal enterprise, thereby eliminating Ms. Armour as falling within the category of "other persons." Granted, the term "victim" within the R.C.M. 1004(c)(4) does not clearly state who qualifies as one. However, a Rule for Courts–Martial should be afforded a reasonable construction which avoids awkward results. *United States v. Powell,* 38 M.J. 153 (C.M.A.1993).

Under the judge's theory, if an accused and an accomplice went into a store to rob the sole clerk present and the accomplice fired one shot, killing the clerk, and then wounded a passerby on the getaway, the aggravating factor would apply since the passerby was not an anticipated victim at the outset. On the other hand, if the same duo went into a crowded bank lobby and the accomplice sprayed the place with head-high machine gun fire, killing only one person, the aggravating factor would not apply since all in the lobby were potential victims at the outset—an absurd result.

Thus, we interpret the term "victim" in R.C.M. 1004(c)(4) as applying to the individual who was killed by the accused's act and not to individuals who were victims in some fashion but were not killed. Therefore, Ms. Armour qualified with Sergeant Marquardt as "persons other than the victim" whose lives were endangered by the appellant's offense.

[42] However, we still conclude the aggravating factor did not apply. The military judge's ruling that only Sergeant Marquardt qualified under that aggravating factor constitutes the law of the case, particularly where the parties fashioned their sentencing arguments around it and the ruling inured to appellant's benefit. *See generally United States v. Morris*, 13 M.J. 297, 299–301 (C.M.A.1982) (Everett, C.J., concurring in the result) (discusses law of the case doctrine and four exceptions to it, none of which we find applicable here). Consequently, we do not bite on appellate government counsel's argument to extend R.C.M. 1004(c)(4) in this case to responding security policemen or any other passersby, and we set aside that aggravating factor.

### 4. Prejudice

■■■■ Instructing court members on an invalid aggravating factor does not automatically reverse an accused's death sentence on appeal. Instead, an appellate court may still affirm the death sentence if it sets aside an aggravating factor as long as the court either: (1) reweighs the remaining aggravating factor or factors and circumstances against the extenuating and mitigating circumstances in the case, or (2) finds the error harmless beyond a reasonable doubt. *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Curtis*, 44 M.J. at 161. To find the error harmless beyond a reasonable doubt, we must be convinced, beyond a reasonable doubt, that the members would have still sentenced appellant to death on the one remaining aggravating factor. *Curtis*, 44 M.J. at 161; *Curtis*, 38 M.J. at 533–35.

■■■■ To deal with the error in this case, we find a harmless error analysis more appropriate, rather than a mere reweighing of the remaining aggravating factor. In courts-martial only court members may impose a death sentence, not the trial judge. *See* R.C.M. 501(a)(1)(B). Thus, we should be concerned with what they would have done if properly instructed. *Cf. Curtis*, 38 M.J. at 533–34. Second, as we will discuss in detail later in the opinion, we have an independent statutory duty to determine the appropriateness of appellant's sentence, which involves balancing the remaining aggravating factor and circumstances against the extenuating and mitigating circumstances. *See* Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Healy*, 26 M.J. 394 (C.M.A.1988).

■■■■ We conclude beyond a reasonable doubt that the invalid aggravating factor did not mislead the members or tip the scale in favor of death. First, the two aggravating factors they were instructed on are very similar, with the valid one requiring them to reach a specific finding on appellant's degree of culpability—that is, whether he was a major participant; and his concern for human life—that is reckless indifference. Second, since the members had already convicted him of attempting to murder Sergeant Marquardt, they would not be swayed by a sentencing instruction requiring them to determine if appellant "unlawfully and substantially endangered" the life of someone other than Sergeant LeVay. Finally, the entire meat and potatoes of this case revolved around the R.C.M. 1004(c)(8) aggravating factor, covering appellant's degree of culpability and reckless indifference to human life. Thus, we are satisfied beyond a reasonable doubt that the members would have sentenced appellant to death for the one remaining aggravating factor. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

### B. Aggravating Circumstances v. Aggravating Factors

#### 1. Background

As required by R.C.M. 1004(b)(7), the military judge instructed the members that they could not impose a death sentence unless they unanimously found beyond a reasonable doubt that at least one **aggravating factor** existed in the case; here, either R.C.M. 1004(c)(4) or (c)(8). As required by R.C.M. 1004(b)(4)(C), he then told them that even if they found an **aggravating factor** existed, they could not impose death unless they found that any and all extenuating or mitigating circumstances were substantially outweighed by any **aggravating circumstances,**

including the **aggravating factors** they had earlier considered.

As for specific aggravating circumstances, the judge instructed the members that they could consider: (*l*) the violent nature of the crimes; that is, the type of weapons used, such as the pipe on Sergeant LeVay, the knife on Sergeant Marquardt, a second pipe, and an assault rifle; (2) that Sergeant LeVay was beaten repeatedly after being knocked unconscious; (3) that Sergeant Marquardt continued to suffer physical injuries requiring medical treatment and cosmetic surgery, and suffered enduring psychological effects; (4) that Ms. Armour also suffered psychological effects; and (5) the LeVay family's grief.

Appellant's counsel did not object to these instructions at trial. On appeal, he argues the judge committed plain error by mixing aggravating circumstances with aggravating factors. He contends the members may impose death only if the specific R.C.M. 1004(c) aggravating factors on which they are instructed substantially outweigh any extenuating or mitigating circumstances. Appellant also argues the combination of aggravating circumstances with aggravating factors amounts to a constitutionally prohibited "double counting" of aggravators. *See Curtis*, 33 M.J. at 108 (discusses double counting theory). We disagree.

### 2. Discussion

■ We examine a military judge's sentencing instructions as a whole to determine if they pass muster. Normally, failure to object to an instruction forfeits any issue concerning it, absent plain error. R.C.M. 1005(f); *United States v. Webel*, 16 M.J. 64 (C.M.A.1983). Capital cases are no exception to the rule. *See Loving*, 41 M.J. at 273–78. Here, we conclude the military judge's instructions properly channeled the court members' discretion in sentencing, outlining for them the difference between aggravating factors and aggravating circumstances. Thus, no error occurred, plain or otherwise.

■ Under R.C.M. 1001(b)(4), the prosecution may always present evidence of aggravating circumstances directly relating to or resulting from the offenses of which the accused is convicted. In a capital case, the prosecution also presents evidence under R.C.M 1004(b)(2) of any aggravating factor which authorizes the death penalty. While these two types of evidence sometimes intertwine, as they did in this case, they do not conflict or amount to a "double counting" of factors.

■ The aggravating factors of R.C.M. 1004(c) identify the class of murderers eligible for the death penalty in courts-martial. The members must unanimously find beyond a reasonable doubt that the accused fits within that class by finding at least one aggravating factor before it may even consider death. However, once the members find an accused fits within the class eligible for the death penalty, they may also constitutionally consider other aggravating circumstances of the case under R.C.M. 1001(b)(4) in determining whether the accused should be sentenced to death, including the circumstances surrounding any aggravating factors. R.C.M. 1004(b)(4)(C); *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Zant v. Stephens*, 462 U.S. at 879–80, 103 S.Ct. at 2744; *Loving*, 41 M.J. at 278–79.

■ Unlike aggravating factors, the members do not have to make findings on whether a particular circumstance is aggravating, extenuating or mitigating. Instead, the trial judge highlights for them various items of evidence which they may consider in determining within which category a particular circumstance falls—which the judge did here.

"What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2743–44. Here, we conclude the members made that individualized determination based on a fair-handed instruction to them which highlighted aggravating, extenuating, and mitigating circumstances which they could consider in fashioning a sentence if they unanimously found an aggravating factor existed.

### C. Order of Voting on Proposed Sentences
#### 1. Background

■ In courts-martial with members, any member may propose a sentence during the

closed sentencing deliberation. The junior member collects the proposed sentences and submits them to the court president. R.C.M. 1006(c). The members then vote on the proposed sentences beginning with the lightest until the members arrive at their sentence—in this case death, which required a unanimous vote. R.C.M. 1006(d)(3)-(4).

Without objection, the military judge reversed the procedure by instructing the members to begin voting first on proposed sentences which included death if they unanimously found an aggravating factor existed beyond a reasonable doubt. Appellant claims this instruction amounts to plain error because it "unconstitutionally channelled [the members'] discretion away from the life option."

### 2. Discussion

■ As we expressed earlier, failure to object to a sentencing instruction normally forfeits the issue absent plain error. In order to obtain relief under the plain error doctrine, an appellant must show unfair prejudice from an obvious error affecting substantial rights. *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For a defective sentencing instruction, even the one complained of here, the error must have "had an unfair prejudicial impact on the [members'] deliberations." *United States v. Fisher*, 21 M.J. 327, 328 (C.M.A.1986) (quoting *United States v. Young*, 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985)). Even when an appellant clears that hurdle, appellate courts should use the doctrine sparingly, "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A.1993) (citations omitted).

■ Here, the judge erred in his instruction. Even though the members found an aggravating factor existed, they could still begin their voting on life first. The aggravating factor only made appellant eligible for the death penalty. However, we conclude the error did not have any impact on the jury's deliberations—because this is a capital case, we are even convinced of that beyond a reasonable doubt. *See Thomas*, 43 M.J. at 582–83 (court did not find plain error where

judge instructed members to begin voting on sentences with death first); *Curtis*, 44 M.J. at 161 (instructional error on aggravating factors harmless beyond a reasonable doubt).

First, the only two key punishments in this case were life and death. The other ancillary penalties such as reduction in rank were of little consequence. The judge instructed the members time and time again that any vote on death had to be unanimous and made only after finding that any aggravating circumstance substantially outweighed any extenuating or mitigating circumstance.

Second, looking at the sentencing instructions as a whole and the record of trial, the instruction did not channel the members' attention away from their sentencing options or inhibit their discussion of same. For example, after the military judge finished his instructions, the members asked if a life sentence included possible parole. The judge accurately told them that parole was a collateral matter and not something for them to consider. *See generally United States v. Quesinberry*, 12 U.S.C.M.A. 609, 31 C.M.R. 195, 1962 WL 4393 (1962) (members should determine sentence without regard to collateral consequences). The members then deliberated for slightly over 5 1/2 hours before asking for an overnight recess. When court resumed the next day, they continued deliberations for another 2 1/2 hours—hardly a snap decision.

Third, during oral argument, we asked appellate defense counsel if appellant's concern was with the procedural accuracy of the vote itself or only the impact the instruction may have had on the members' frank and full discussion of their sentencing options. Appellate defense counsel answered, "impact." The instruction on voting would not have interfered with any discussion. The military judge specifically told the members that the "deliberations should begin with a full and free discussion on the subject of sentencing" before anyone proposed a sentence, much less voted on one. As pointed out above, the length of their deliberations, while not determinative of the issue, shows the members did not rush to judgment in this case.

We now turn to what all of us, majority or dissenting, agree is the crux of this case: whether appellant's sentence to death is appropriate.

## VI. APPROPRIATENESS OF DEATH PENALTY

Appellant was the engineer of the train of death which crushed the life from Sergeant LeVay's body. Although he showed a marked indifference to the value of that life, he now asks us to blind ourselves to that indifference and find that his death sentence is both disproportionate to his felony murder offense and too severe. We discuss proportionality first.

### A. Proportionality

#### 1. Legal Background

The concept of proportionality involves an appellate court objectively evaluating the appropriateness of a sentence for a particular crime by looking at: (1) the gravity of the offense and severity of the penalty, (2) sentences imposed for other crimes, and (3) sentencing practices in other jurisdictions. In capital cases, the Constitution does not require a proportionality review for the death sentence where the sentencing procedure sufficiently narrows the class of persons subject to that penalty. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Since court-martial sentencing procedures accomplish that task, proportionality reviews are not *constitutionally* required in military capital cases. *Curtis*, 32 M.J. at 270–71, quoted in *Loving*, 41 M.J. at 290. The military sentencing procedures are constitutionally sound. *Loving*, —— U.S. at ——, 116 S.Ct. at 1751.

However, the Court of Appeals for the Armed Forces, then the United States Court of Military Appeals, determined in *United States v. Curtis* that the service Courts of Criminal Appeals should review any death sentence to determine "whether the sentence is *generally* proportional to those imposed by other jurisdictions in similar situations." *Curtis*, 33 M.J. at 109 (citations omitted). The Court based the requirement on our statutory duty to determine sentence appropriateness under Article 66(c), UCMJ, 10 U.S.C. § 866(c).

In Article 66(c), Congress conferred upon us an "awesome, plenary, *de novo* power of review." *United States v. Cole*, 31 M.J. 270, 272 (C.M.A.1990). The service Courts of Criminal Appeals have unique statutory fact-finding powers not shared by other Federal appellate courts. In the normal course of appellate review, we may substitute our judgment for that of the military judge on the law or the facts. Likewise, we may substitute our judgment for the court members when they sit as the trier of fact. In considering the record, we may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that we did not see and hear the witnesses. Article 66(c), UCMJ; *Cole.* Consequently, we may only affirm a conviction when convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987), *pet. denied*, 28 M.J. 78 (C.M.A.1989). Similarly, we may only affirm a sentence which we find appropriate both in law and fact. *Healy*, 26 M.J. 394 (C.M.A.1988).

Except for the power to suspend, we have almost unlimited power to lessen a sentence to the level we deem appropriate. *Healy; see also United States v. Henry*, 42 M.J. 231, 234 (1995) (discusses legislative intent regarding service appellate court's sentencing discretion). For example, we may reduce appellant's sentence to life imprisonment if we feel death is not appropriate based on our independent judgment. Thus, the concept of proportionality pales in comparison to our normal appellate review for sentence appropriateness since we must always determine that the sentence fits the crime, the circumstances of the offense, and the offender. With that background, we undertake the mandated proportionality review for appellant's murder offense.

#### 2. Proportionality Review

Appellant argues that to pass proportionality muster, we must find another appellate case affirming a "nontriggerman's" death sentence for felony murder. As an alternative theory, appellant argues his death

sentence fails proportionality review because numerous other criminals who committed much more heinous murders have received life sentences, or less. We reject both arguments.

■■■■ Proportionality review, like sentencing at trial, is not a rote science, particularly in capital cases. If it were, we could just feed appellant's case into a computer along with all the appellate opinions on hand and await the result. Instead, individuals and their cases are unique, as are their juries and judges, both trial and appellate. Thus, merely comparing one case to another to see who is the worse murderer is not the benchmark for a proportionality review. *Pulley v. Harris; Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct. 3001, 3010–11, 77 L.Ed.2d 637 (1983); *Curtis,* 32 M.J. at 270.

According to appellant's research, and ours, the Supreme Court has not affirmed a "nontriggerman's" death sentence for felony murder since reinstating the death penalty in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We also agree with appellant that this is the first military case where an accused was sentenced to death for felony murder but did not physically kill the victim. However, "[a]ny system of review that requires a comparison of each case with all similar prior cases must have a beginning. There will be a first case for each type or category of capital case that may appear and that first case necessarily cannot be compared to any other similar cases. The first case must stand alone, otherwise comparative sentence review would be forever impossible." *State v. Shaw,* 273 S.C. 194, 255 S.E.2d 799, 807 (1979) (footnote omitted) (*overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991)), quoted in *Curtis,* 32 M.J. at 270 n. 23.

■■■ Without other military appellate cases on all fours with appellant's case, we believe proportionality review requires us to look objectively at appellant's sentence and determine whether it is disproportionate based on the gravity of the offense and severity of the penalty, sentences imposed for other crimes, and sentencing practices in other jurisdictions. *Pulley v. Harris,* 465 U.S. at 43, 104 S.Ct. at 875–76. In other words, may an accused be sentenced to death for felony murder when the accused was the nontriggerman? As we pointed out in our discussion on aggravating factors, the Supreme Court has said "yes," provided the accused was a major participant in the felony and manifested a reckless indifference to human life. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The members unanimously found that circumstance existed beyond a reasonable doubt and so do we.

Appellant attempts to downplay his role in the robbery and murder, portraying himself as a minor player—a mere getaway driver. We on the other hand find he was not just a major participant in the felony—he was its commander-in-chief. He drew up the plans, selected the members for the gang (including two individuals whom he later described as ruthless murderers), and identified replacements for the gang when some of them fell out. He assigned the jobs to the accomplices—choosing the safety of the getaway car for himself—directed that his accomplices arm themselves with firearms and pipes, and furnished the murder weapon. Furthermore, he made no effort to assist Sergeant LeVay before, during, or after the beatings. Instead, he continued with his plan. *See Tison,* 481 U.S. at 152, 107 S.Ct. at 1685. In essence, appellant's grip on the lead pipe which struck the fatal blows was as tight as his brother's, if not more so.

Appellant also showed a reckless indifference to human life. Appellant decided that Dennis Simoy would "knock out" the security police escort with a lead pipe. When Wolford questioned whether Dennis Simoy's blow might kill the escort, appellant remarked indifferently, "If the guy dies, he dies." Appellant's statement proved chillingly prophetic since Sergeant LeVay's treating physician testified that "one hit could have been sufficient to kill someone"—an opinion with which the pathologist concurred. Likewise, when one of his confederates suggested killing everyone so they "won't talk," appellant did not disagree, although he heard the comment and was the leader. Finally, appel-

lant commanded the murder, albeit unsuccessful, of an innocent bystander who only posed a minor threat to his getaway, because he might identify him. As the Supreme Court observed in *Tison,* "the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." 481 U.S. at 153, 107 S.Ct. at 1686.

Thus, we are satisfied that the death sentence is not disproportionate for the felony murder in this case based on Supreme Court precedent in *Enmund* and *Tison.* However, as a matter of caution, we have also considered the numerous cases cited by the appellate courts in *Loving* (41 M.J. at 290–291, 34 M.J. 956, 969 n. 18) as well as the various decisions cited within this opinion. Also, if one accepts appellant's argument that we must fit his case directly into another's pigeon hole, we have considered *Hatch v. Oklahoma* (cited previously in Section IV.B.2.) which we now briefly discuss.

On October 15, 1979, Steven Hatch and Glen Ake entered the Douglass home with firearms intending to rob the occupants. They bound and gagged Reverend Douglass, his wife, and son. They then ransacked the house, stole items, and attempted to rape the Douglass' 12–year–old daughter. After Hatch covered each of the victim's heads with an article of clothing, Ake told him to return to the car, turn it around, and "wait for the sound." Once Hatch left, Ake shot the Douglasses, killing the parents but only wounding the two children.

Hatch was convicted of capital first degree felony murder in Oklahoma; that is, a killing during a robbery with a dangerous weapon, and was sentenced to death. Ake was also convicted of capital murder and sentenced to death, but his death sentence was ultimately reduced to life imprisonment on appeal. Hatch tried to overturn his death sentence on appeal and by writ of *habeas corpus,* arguing he was not the triggerman and his death could not be legally justified when the real killer, Ake, received a lesser sentence.

As the United States Court of Appeals for the Tenth Circuit pointed out, proportionality review does not equate to sentence comparison. Instead, the Constitution only entitles an accused to a determination of individual culpability, and Hatch got that determination. *Hatch v. Oklahoma,* 58 F.3d at 1466. On August 9, 1996, Hatch was executed by lethal injection. Lois Romano, *Execution Closes a Tragic Circle; Douglass Children Watch Their Parents' Killer Die,* WASH. POST, Aug. 10, 1996, at A3.

In summary, we find appellant's sentence is *"generally* proportional to those imposed by other jurisdictions in similar situations." *Curtis,* 33 M.J. at 109 (citations omitted). *See also Johnson v. State,* 691 S.W.2d 619 (Tex.Cr.App.1985) (accused's death sentence for murder affirmed even though he did not actually kill during robbery), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985); *State v. Laws,* 661 S.W.2d 526 (Mo. 1983) (same), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *White v. State,* 403 So.2d 331 (Fla.1981) (same), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983).

### B. Sentence Appropriateness

A finding of proportionality does not end our analysis, however. We must still determine whether the death sentence is appropriate for appellant, considering all the facts and circumstances of the case. *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982). To affirm the death penalty, we must be convinced from the evidence admitted at trial that any aggravating circumstances admissible under R.C.M. 1001(b)(4) substantially outweigh any extenuating or mitigating circumstances. *See* Article 66(c), UCMJ, 10 U.S.C. § 866(c); R.C.M. 1004(b)(4)(C). We find the death sentence appropriate and that the aggravating circumstances substantially outweigh any extenuating or mitigating circumstances.

In weighing the aggravating circumstances against the extenuating and mitigating circumstances, we are not bound by the aggravating factors. As we previously discussed in Section V.B.2., we may consider any aggravating circumstances directly relating to or resulting from the offenses.

In addition to the aggravating circumstances already discussed, we find it particu-

larly aggravating that a uniformed security police law enforcement officer was killed while in the execution of his office after appellant knowingly planned and directed an armed aggravated assault upon him. In this regard, most people know that substantial physical harm—even a "grave risk of death" (*see Tison*, 481 U.S. at 157, 107 S.Ct. at 1687–88)—may occur when you strike someone in the head with a lead pipe hard enough to "knock him out." Furthermore, appellant did not direct his attack against a stranger. Rather, he unleashed Dennis Simoy on another member of his own unit who was performing the exact duty which he had previously performed, escorting the same Air Force civilian employee whom he had escorted. We also find it aggravating that appellant used knowledge and training garnered from his official police duties to plan the armed robbery and physical attacks in this case. Appellant was fortunate at trial that the prosecutor did not add these aggravating circumstances to the specific R.C.M. 1001(b)(4) list that he asked the trial judge to instruct upon.

Appellant argues that the evidence shows that killing someone was not a part of the original robbery plan, a mitigating factor on which the judge instructed the members, as well as the fact that appellant was not the one who actually committed the murder or attempted murder. While murder may not have been part of the original plan, appellant showed absolutely no hesitation in employing physical violence and dangerous weapons to achieve monetary gain. Moreover, when the idea first surfaced that someone might die in the ambush, appellant was unconcerned—"If he dies, he dies." Furthermore, appellant showed his true colors with the attack on Sergeant Marquardt—when the opportunity came, he was willing to kill an innocent bystander, a mere witness, to perfect his getaway.

■ Appellant also renews his argument that death is not appropriate when the real killer was sentenced to life. Normally, military appellate courts and convening authorities cannot consider the punishments in other cases in determining an appropriate sentence for an accused. However, as a matter of

discretion under military law, convening authorities and the service Courts of Criminal Appeals may examine the punishments in other closely related or connected cases **within the same jurisdiction** when there is a direct correlation between each accused and their respective offenses, the punishments are "highly disparate," and good and cogent reasons do not exist for the disparity. *United States v. Ballard*, 20 M.J. 282 (C.M.A.1985); *United States v. Olinger*, 12 M.J. 458 (C.M.A.1982); *United States v. Commander*, 39 M.J. 972 (A.F.C.M.R.), *pet. denied*, 40 M.J. 283 (C.M.A.1994).

The military did not have jurisdiction to try Dennis Simoy, and as we discussed previously, defense counsel conceded at trial that Federal authorities in Guam could not legally seek the death penalty for Dennis. Thus, sentence comparison is not truly applicable to this case, either for proportionality review or sentence appropriateness. *But see United States v. Hawkins*, 37 M.J. 718, 722 (A.F.C.M.R.1993) ("sentence comparisons among cases disposed of in civilian courts and those tried by courts-martial are even less persuasive than comparisons among courts-martial sentences, given the differing approaches in the civilian and military systems to sentencing principles and the administration of punishment"), *pet. denied*, 39 M.J. 442 (C.M.A.1994). However, out of an abundance of caution and recognizing the oft-repeated saying that "death is different," we will consider Dennis Simoy's sentence in determining the appropriateness of death for appellant since the prosecuting sovereign, the United States, was the same in both cases.

■ Sentences of life imprisonment and death are highly disparate sentences. However, we find good and cogent reasons for the disparity. First, appellant was the commander-in-chief of the armed robbery—its motivator, solicitor, and initiator. Appellant directed the various physical attacks, including the aggravated assault which resulted in Sergeant LeVay's death. Second, unlike Dennis Simoy, appellant was ready to kill an innocent bystander. Third, it would appear from the evidence that Dennis Simoy attacked a mere stranger; whereas, appellant

directed the physical assault upon his own squadron mate and an Air Force civilian employee.

While it is undeniable that Dennis Simoy probably received an undeserved "windfall" from the fact that he was a civilian prosecuted at a time when the Federal capital sentencing scheme was in a state of uncertainty and flux, we find appellant's sentence to death is appropriate. *Cf. Hutchinson,* 15 M.J. at 1068 (affirming accused's death sentence for premeditated murder and felony murder although co-conspirator sentenced to 50 years confinement).

## VII. OTHER ISSUES

Although we have individually considered each of his 53 assigned errors, the appellant's remaining issues do not merit much discussion and do not warrant any relief.

### A. Death–Qualified Counsel

### (Issues X, XII)

■ Appellant argues he is entitled to representation by counsel "qualified for death penalty cases" under American Bar Association guidelines, and to "uninterrupted continuity of counsel unaffected by peacetime military personnel decisions." The Court of Appeals for the Armed Forces has properly rejected the notion that trial and appellate defense counsel must be "death-qualified" in a capital case. *Curtis,* 44 M.J. at 126, 129–30; *Loving,* 41 M.J. at 300.

At trial, appellant had continuity of counsel who were statutorily qualified to represent him. *See* Article 27, UCMJ, 10 U.S.C. § 827. Moreover, the military judge fully advised appellant of his statutory rights to counsel, and appellant knowingly selected the team who defended him. *See* Article 38, UCMJ, 10 U.S.C. § 838; *Curtis,* 44 M.J. at 127. Before this Court, one primary military appellate counsel represented appellant. This counsel was not reassigned until after all briefs were filed, the case was orally argued, and appellant voluntarily released him.

### B. Multiplicity

### (Issue XI)

■ Appellant argues that Charges III (attempted murder of Sergeant Marquardt) and IV (robbery) are multiplicious—that is but one offense—for findings and sentencing with Charge II (felony murder of Sergeant LeVay), because they were part of one continuous course of conduct. However, at trial, defense counsel did not raise that issue and expressly declined any sentencing "instruction concerning multiplicity" when the military judge first broached the subject.

In *United States v. Lloyd,* 43 M.J. 886 (A.F.Ct.Crim.App.1995), we established a bright-line rule that multiplicity issues were forfeited unless raised at trial. Here, however, we have more than a mere forfeiture. Defense counsel knowingly and intelligently waived any multiplicity issue after sufficiently discussing the topic with the judge. *See United States v. Spears,* 39 M.J. 823 (A.F.C.M.R.1994) and cases cited therein.

■ Even without forfeiture or waiver, it is clear to us that clubbing Sergeant LeVay to death, attempting to murder Sergeant Marquardt, and robbing Ms. Armour and Sergeant LeVay (as he lay dying) are totally discrete offenses—separate victims and separate in time—and are not multiplicious. *See United States v. Wheeler,* 40 M.J. 242 (C.M.A.1994); *United States v. Hennis,* 40 M.J. 865 (A.F.C.M.R.1994), *pet. denied,* 42 M.J. 210 (1995). Moreover, the MCM specifically recognizes that the underlying felony, in this case robbery, "may be charged separately from the homicide." MCM, Part IV, ¶ 43c(5)(b); *see also United States v. Smith,* 13 U.S.C.M.A. 553, 33 C.M.R. 85, 91, 1963 WL 4819 (1963) (felony murder and robbery separately charged). If offenses are separate for findings, they are separate for punishment. R.C.M. 1003(c)(1)(C); *United States v. Morrison,* 41 M.J. 482 (1995); *United States v. Dolbow,* 44 M.J. 814 (A.F.Ct. Crim.App.1996); *United States v. Lenoir,* 39 M.J. 751 (A.F.C.M.R.), *pet. denied,* 40 M.J. 276 (1994).

## C. Other Evidentiary Rulings by the Military Judge

### (Issues VII, XLI, XLIII, XLV, and XLVI)

Appellant attacks the judge's decision denying a motion to suppress some of appellant's pretrial statements, denying a motion *in limine* to exclude prior acts of uncharged misconduct, admitting out-of-court statements of non-testifying co-conspirators, admitting two death certificates of Sergeant LeVay, and excluding an Army regulation dealing with executions at the U.S. Disciplinary Barracks.

■■■ As discussed earlier, we will overturn an evidentiary ruling of the military judge only if there was an abuse of discretion. *United States v. Sullivan*, 42 M.J. 360, 363 (1995); *United States v. McLaren*, 38 M.J. 112 (C.M.A.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994). We find no abuse of discretion in any of the military judge's rulings on these issues. Furthermore, applying a *de novo* standard of review to the voluntariness of appellant's confession, we find appellant freely, knowingly, and intelligently waived the presence of his counsel before making his statements to investigators on January 16, 1992. *See* MIL. R. EVID. 305(g)(1) (waiver of rights); *United States v. LeMasters*, 39 M.J. 490 (C.M.A. 1994) (waiver of notice to counsel); *United States v. Vaughters*, 42 M.J. 564, 566 (A.F.Ct. Crim.App.1995) (standard of review for confessions), *aff'd*, 44 M.J. 377 (1996).

## D. Precluding Guilty Pleas to "Felony" Offenses

### (Issue IX)

■■■ The appellant alleges the military judge "improperly limited" his submission of mitigation and extenuation by not allowing him to plead guilty to conspiracy to commit robbery, attempted murder, and armed robbery. First of all, there is no constitutional right to plead guilty. *United States v. Matthews*, 16 M.J. at 362. Second, Congress has specified that an accused may not plead guilty to any offense for which the death penalty may be adjudged. Article 45(b), UCMJ, 10 U.S.C. § 845(b). An accused's plea of guilty to offenses underlying a capital felony murder charge may in effect amount to a prohibited plea of guilty to the capital offense. *See United States v. Dock*, 28 M.J. 117 (C.M.A.1989).

By a plea of guilty to the three charges, appellant would have admitted a key element of the capital offense—that he was engaged in the perpetration of a robbery—leaving the government to prove only that Sgt. LeVay was dead, the death resulted from an act or omission of the appellant, and that the killing was unlawful. *See* MCM, Part IV, ¶ 43b(4). It wouldn't take a rocket scientist to establish the remaining three elements once appellant admitted by his guilty pleas that he was involved in, if not the mastermind for, the robbery conspiracy (Charge I); that he was involved in the attempted murder of Sergeant Marquardt (Charge III); and that he was, in fact, guilty of robbery *from the murder victim* and Ms. Armour (Charge IV).

The defense argued that the appellant could have pled guilty to Charges I, III and IV (and, of course, Charge V, desertion) and fully litigated Charge II, hiding the pleas of guilty from the members. We need not decide whether the appellant could have fully litigated the felony murder charge without impeaching his proposed pleas of guilty; frankly, we doubt that so many angels could've danced on the head of that pin. In any event, the clarity of 20/20 hindsight is not the standard we use in evaluating this issue. The military judge—who, at the appellant's arraignment, knew much less about the facts of the case than everybody does now—determined that there was a substantial risk that Article 45(b) might be violated if he accepted pleas of guilty to anything but desertion (Charge V). He did not abuse his discretion.

## E. Rulings on Miscellaneous Motions

### (Issues II, IV, V, and VI)

We have carefully reviewed the rulings on appellant's motions for appropriate relief attacking "the administration of capital cases" in general (and the referral of his own case as capital in particular). We won't spend any more time discussing the constitutionality or legality of military capital sentencing rules

which the Supreme Court and Court of Appeals for the Armed Forces resolved in the *Loving* and *Curtis* series of cases. The military judge noted that the "decision to refer the case to trial as a capital case [was] based on what the convening authority was provided" after the Article 32 investigation was completed. The military judge found that the convening authority did not abuse his discretion in referring the case as capital. We·agree.

■ Appellant also argues the judge erred in denying his broad motion to compel discovery. Appellant's counsel asked to examine interview notes compiled by one of the Federal prosecutors assigned to Dennis Simoy's case, and to interview the convening authority to determine the extent to which his discretion was influenced by extraneous matters. The military judge reviewed the interview notes *in camera* and denied discovery. The judge permitted defense counsel to interview the convening authority to determine if he was influenced by information in an investigative report submitted to him in addition to the Article 32 investigation. We find no abuse of discretion in the handling of these issues. *See United States v. Charles,* 40 M.J. 414 (C.M.A.1994); *United States v. Branoff,* 38 M.J. 98 (C.M.A.1993).

### F. Argument, Instructions and Voting

*(Issues XXIV, XXV, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, XXXIII, and XLVII)*

Appellant next complains about the wording and timing of some of the sentencing instructions, the form of the sentence worksheet, and the trial counsel's sentencing argument. No objection was raised at trial; hence, any objection is forfeited absent plain error, which we do not find here. *See* R.C.M. 1001(g), 1005(f). Moreover, the Court of Appeals for the Armed Forces rejected nearly all of appellant's instructional complaints in *Loving* and *Curtis.*

■ Appellant attacks the designation of the senior member of the court-martial panel as the "president" of the court, arguing that this procedure established "the senior member's superiority in and control of the deliberation process." *See* R.C.M. 502(b)(2). In making this attack on a procedure designated by the President and upheld through numerous changes to the MCM and UCMJ, the appellant points to no evidence of any undue or improper influence exerted by the president of *his* court on the other members. *See Curtis,* 44 M.J. at 150. This issue totally lacks merit.

### G. Convening Authority Disqualification

*(Issues XVII and XLIV)*

■ Appellant contends the convening authority was "disqualified" from taking action in this case because his wife and "his vice commander" attended memorial services with Sgt LeVay's wife, an issue also raised in his discovery motion. As noted above, trial defense counsel had the opportunity to determine the extent to which the convening authority was subject to outside influences, even though the judge did not permit an interview concerning the memorial service. Counsel were apparently satisfied that the convening authority had no disqualifying involvement since they did not raise any objection at trial. Absent any evidence to the contrary, we presume the convening authority performed his duties in a proper manner. *United States v. Moschella,* 20 U.S.C.M.A. 543, 43 C.M.R. 383, 1971 WL 12804 (1971); *United States v. Townsend,* 12 M.J. 861 (A.F.C.M.R.1981).

In a different twist, appellant asserts the convening authority "did not understand the law and his options" regarding the detailing of enlisted court members to appellant's court panel. The convening authority referred this case to trial after an Article 32, UCMJ, investigation and pretrial advice from his staff judge advocate under Article 34, UCMJ, 10 U.S.C. § 834. There is no evidence that the convening authority did not understand his duties. This assignment of error also totally lacks merit.

### H. Staff Judge Advocate's Recommendation

*(Issues XLII and XLVIII)*

Appellant alleges that the convening authority's approval of total forfeitures of pay

and allowances was a nullity because the staff judge advocate's recommendation (SJAR) (see R.C.M. 1106) did not advise him that appellant was not receiving pay due to the expiration of the appellant's enlistment. Furthermore, the appellant alleges that the SJAR was deficient because it failed to address the issue of "sentence comparison" between himself and his brother.

The amount of pay that appellant actually receives has no bearing on the legality of the sentence approved by the convening authority. If the appellant is entitled to payment, he will forfeit it—if he isn't, he won't. Regarding sentence comparison, R.C.M. 1106(d)(4) does not require the SJAR to specifically address that issue—only to respond to the appellant if he addresses it, which the SJA did in his Addendum. See R.C.M. 1106(f)(7). In any event, we laid the sentence comparison issue to rest in Section VI.B.

### I. Miscellany

### (Issues XIII, XIV, XV, XVI, XVIII, XIX, XX, XXI, XXII, XXXIV, XXXV, XXXVI, XXXIX, XLIX, LI, LII, LIII)

Our superior courts have resolved most of the remaining litany of issues adversely to appellant in Loving and Curtis, and we will briefly comment on those issues below. As to Issue XLVIII, we find no cumulative error prejudicing appellant. See United States v. Banks, 36 M.J. 150, 170–71 (C.M.A.1992) (brief discussion of cumulative error doctrine).

Appellant argues, broadly, that "court-martial procedures denied [him] his Article III right to a jury trial" (Issue XVI); his "Sixth Amendment right to a jury trial and an impartial cross-section of the community" (Issue XIX); and his "Fifth Amendment right to a grand jury presentment or indictment" (Issue XIV). These issues were resolved adversely to him in Curtis, 44 M.J. at 130–33.

He asserts the "death penalty sentencing standard requiring aggravating factors to 'substantially outweigh' extenuating and mitigating circumstances is unconstitutional; the only acceptable standard must be 'beyond a reasonable doubt' " (Issue XXVIII). This argument was also resolved against him in Curtis, 44 M.J. at 159, and Loving, 41 M.J. at 278–79, 291.

Appellant contends that R.C.M. 1004 is unconstitutional under the Fifth and Eighth Amendments and violates Article 55, UCMJ, "by not requiring that sentencing procedures be more detailed and specific to allow a rational understanding by the military judge, convening authority, and appellate authorities as to the standards used by the panel" (Issue XXXIV). This allegation refers to the trial defense team's failure to "force the members to delineate on the [Sentencing] Worksheet which mitigating factors were considered and which were rejected." Assignment of Errors and Brief at 110. As in Curtis, 44 M.J. at 163, trial defense counsel was given an opportunity to comment on the sentencing worksheets (there were two in this case) and had no objection to either. In the absence of plain error—and there was none—the issue was forfeited.

Appellant argues the prosecution should not have been allowed to make a "Witherspoon challenge after the convening authority exercise[d] his Article 25 statutory responsibility in detailing members" (Issue XX). See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He further argues that the "peremptory challenge procedure in the military justice system" is constitutionally defective "where the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause, contrary to ... Morgan v. Illinois [504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)]" (Issues XXI and XXII). All of the issues appellant raises concerning peremptory challenges have been decided against him. See Curtis, 44 M.J. at 131–32.

Appellant next alleges that "R.C.M. 1004(c)(8)'s use as an aggravator was illegal, unconstitutional, and materially prejudicial" (Issue XXXIX). As discussed earlier, R.C.M. 1004(c)(8) provides for the death penalty for felony murder when the accused was a major participant who manifested a reckless indifference for human life. This provision was based directly on the Supreme

Court's decisions in *Enmund v. Florida* and *Tison v. Arizona.* *See* R.C.M. 1004(c)(8), Analysis. Therefore, its inclusion in the list of "aggravators" is "constitutional." The real question is the factual call as to whether we find sufficient evidence to affirm the members' determination that the prosecution proved this aggravating factor beyond a reasonable doubt. Article 66(c), UCMJ. We do. *See* our discussion in Part VI above. Moreover, as the Supreme Court pointed out in *Tison,* "The reckless indifference to the value of human life may be so shocking to the moral sense as an 'intent to kill.'" 481 U.S. at 157, 107 S.Ct. at 1688.

■ Appellant alleges that the requirement in the UCMJ for capital cases to be tried before members—never judge alone—violates due process (Issue XIII). *See* Article 18, UCMJ, 10 U.S.C. § 818; R.C.M. 201(f)(1)(C). Further, he alleges that the statutory exclusion from the court panel of enlisted members from the appellant's own unit "injects an improper criterion (enlisted status) in selecting the members pool" (Issue XV). *See* Article 25(c)(1), UCMJ, 10 U.S.C. § 825(c)(1). The Court of Appeals for the Armed Forces has considered and rejected both of these arguments. *See Curtis,* 44 M.J. at 130.

Appellant argues that "the Fifth, Sixth, and Eighth Amendments do not permit, in peacetime, a convening authority to handpick military subordinates ... as members to decide a capital case" when there is concurrent jurisdiction with the Federal courts (Issue XVIII). The *Curtis* court heard and rejected this argument. *Curtis,* 44 M.J. at 130–32.

As for the appellate process in general, appellant asserts this Court must unanimously agree on both findings of guilt and the sentence of death and must apply the policy of *in favorem vitae* (Issue XXXVI). As noted in *Loving,* 41 M.J. at 266, and *Curtis,* 44 M.J. at 165, the Supreme Court has rejected the policy of an *in favorem vitae* ("in favor of life") approach to appellate review of capital cases (citing *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)). Appellant cites no other authority for a require-

ment for unanimous affirmation of his findings and sentence, and we find none.

He further argues that this Court has a "supervisory role in ensuring that counsel are qualified in training and experience to defend a capital case" (Issue XXXV). This issue was rejected in *Loving,* 41 M.J. at 300. Parenthetically, we have previously noted (*see* Section II) that appellant's counsel were qualified to try this case.

Finally, the three supplemental issues (Issues LI, LII, and LIII)—identified by the appellant as "*Loving* issues"—have been resolved adversely to him by the Supreme Court and the Court of Appeals for the Armed Forces.

## VIII. CONCLUSION

Death sentence cases in the military involve lengthy trials, double-digit issues asserted on drawn-out appeals which always include claims that the defense lawyer was incompetent and the death sentence too harsh for murdering another. This case is no different. Having individually read every page in the record of trial and considered the briefs, we are convinced appellant received an extraordinarily fair trial and the death sentence is appropriate in this case. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge SCHREIER and Judges GAMBOA, STARR, and SENANDER concur.

Judge MORGAN, C. H., II (concurring):

While I join unreservedly in the lead opinion's conclusions with respect to the ineffective assistance of counsel claim, I deem it essential to discuss an error committed by trial defense counsel which comes closer—much closer—to breasting the high thresholds of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Lockhart v.Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

The Fifth Amendment to the Constitution expressly withholds the right to a grand jury indictment in those cases "arising in the land or naval forces, or in the Militia." Since *Ex*

*parte Milligan,* 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866), this specific exception has been assumed to extend to the right to trial by a petit jury guaranteed in the Sixth Amendment. *Ex parte Quirin,* 317 U.S. 1, 40, 63 S.Ct. 2, 16–17, 87 L.Ed. 3 (1942) ("we must conclude that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by a military commission"). *See also United States v. McClain,* 22 M.J. 124, 128 (C.M.A.1986) (courts-martial have never been considered subject to the jury-trial demands of the Constitution).

Recognition of this limitation may have motivated, in part, the coordinate decision by our first Continental Congress to withhold from courts-martial jurisdiction over capital offenses which were not uniquely military. These were to be tried in civilian courts. AMERICAN ARTICLES OF WAR OF 1776, Section X, Art. 1, reprinted in W. WINTHROP, MILITARY LAW AND PRECEDENTS 964–65 (reprint 2d ed.1920). Congress' undeclared preference for the procedural and substantive benefits state criminal jurisdictions afforded a soldier or sailor accused of a capital crime in peacetime carried over through 1916 when Congress conferred jurisdiction on military courts over certain common-law felonies. Notably, murder and rape committed within the continental United States during peacetime were excepted. *See discussion, Loving v. United States,* —— U.S. ——, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). It was not until passage of the Uniform Code of Military Justice in 1950 that Congress granted undifferentiated jurisdiction over non-military capital crimes to courts-martial. *Id.*

The ebb and flow of courts-martial jurisdiction over common law crimes reflected the dynamic tension between the exigencies of administering justice in the military context, recognized by the drafters of the Constitution, and the notion that a citizen-soldier ought to be afforded the full panoply of rights available consistent with the limitations of military service. In the Supreme Court, as well, the balance was struck on first one side, and then the other. *Compare O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) (military juris-diction restricted to service connected crimes "lest [the military exemption in the Fifth Amendment] be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers"); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 23, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955) (courts-martial to be limited to least possible power adequate to the end proposed) *with Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987) (overruling *O'Callahan* on basis that Article I, § 8, cl. 14, confers on Congress the "delicate task of balancing the rights of servicemen against the needs of the military").

The foregoing historic discussion of the treatment of common law felonies in the military is critical to understanding the gravity of appellant's counsel's mistake. After all, the heart of the objection of those favoring limitation of court-martial jurisdiction was the absence of a guarantee of a trial by jury in courts-martial, a right "central to our constitutional scheme of justice" which "should not be lightly abrogated." *Solorio,* 483 U.S. at 456, 107 S.Ct. at 2936 (Marshall, J., dissenting). It is particularly ironic, therefore, that by virtue of the procedures peculiar to capital cases under the UCMJ and the decision of his convening authority, appellant found himself, initially, with two of the most important attributes of a common law petit jury—namely, 12 members and the necessity for a unanimous vote. The requirement for unanimity unmistakably manifests a legislative desire to afford every practicable benefit to an accused in capital cases. Convictions otherwise require only a two-thirds majority. *See* Article 52, UCMJ, 10 U.S.C. § 852.

But if unanimity were a feature of the statutory scheme of the UCMJ respecting capital cases which appellant could not, even voluntarily, forsake, the initial appointment of 13 officers and enlisted people to appellant's court was a boon which could be squandered, and was. Alone among all criminal jurisdictions in the United States, a member of the armed forces may be sentenced to death by a "jury" of as few as 5 people without offending the Constitution. Article

16, UCMJ, 10 U.S.C. § 816.[1] That the convening authority was not required to appoint as many people to the court as he did hardly relieves defense counsel from the obligation, within the limits of the prescriptions of the UCMJ and the Rules for Courts–Martial, to preserve that benefit for their client. In this respect, at least, counsel for appellant faltered.

From the beginning of the trial it was plain that a felony murder conviction was a foregone conclusion.[2] Indeed, but for the prohibition of a guilty plea in capital cases, appellant would have pled guilty to felony murder. Still, to avoid the death penalty, counsel required only one dissenting vote at any of three critical junctures: the vote on the finding as to felony murder; the vote on the aggravating factors; and the vote on the death sentence. With that simple strategic objective in mind, it confounds reason to understand how defense counsel could have acquiesced in, much less actively contributed to, relieving the prosecution of the obligation to persuade 5 of the 13 people to vote in favor of death as to each of the three critical issues. Yet that is exactly what happened.

The court-martial panel began with 13 members. Trial defense counsel successfully challenged three members for cause,[3] and the prosecutor exercised a peremptory challenge. Astonishingly, appellant's counsel also exercised a peremptory challenge, thereby accounting, single-handedly, for four of the five members ultimately excused. Only one of these four members had given the slightest indication that he was fixed on the death penalty.

Little mathematical sophistication is required to appreciate the profound impact in this case of reducing the court-martial panel size. To use a simple metaphor—if appellant's only chance to escape the death penalty comes from his being dealt the ace of hearts from a deck of 52 playing cards, would he prefer to be dealt 13 cards, or 8? If he had been made to understand the algorithm of his trial court in those terms, would he have consented to his counsel's connivance in reducing the number of cards he was dealt?

People are not playing cards, of course. Human behavior is more complex, and there is a chance that no "ace of hearts" existed in the entire military community who would have voted against the death penalty, much less among the challenged five members.[4]

---

1. Interestingly, the ARTICLES OF WAR OF 1776, article 1, Section XIV, declared that any general court-martial "shall not consist of less than thirteen commissioned officers." W. WINTHROP, MILITARY LAW AND PRECEDENTS 967 (reprint 2d ed.1920). This requirement yielded to the exigencies of the post-Revolutionary War Army, wherein there were remote outposts with but a few officers, and only approximately 50 officers in the entire Army. Allred, *Rocks and Shoals in a Sea of Otherwise Deep Commitment: General Court-Martial Size and Voting Requirements*, XXXV NAVAL LAW REVIEW 153, 163 (Spring 1986). Article 1 of the AMERICAN ARTICLES OF 1786 permitted general courts-martial to "consist of any number of commissioned officers from 5 to 13 inclusively; but *they shall not consist of less than 13, where that number can be convened without manifest injury to the service.*" Winthrop, *id.* at 972. (Emphasis added.)

2. I make this declaration mindful that it is made with the crystal clarity which only hindsight can afford. However, in their affidavits, defense counsel acknowledge this to have been their assessment as well. "Mr. Trapp and I decided shortly after he entered the case that the prosecution's evidence against Senior Airman Simoy was overwhelming and that we would certainly be presenting a sentencing case." Affidavit of Major Bernard E. Doyle, Jr., 13 February 1995.

Since we evaluate counsel's performance on the basis of their own strategic judgments formed at the time, we may safely assume that the pivotal issue for appellant, indeed the *only* issue, was whether he received life, or death.

3. Of these, only one, MSgt Bowdren, expressed any clear presentiment in favor of the death penalty, declaring he would "automatically vote for capital punishment without regard to the evidence." Notwithstanding this clear indication of a fundamental lack of the judicial temperament required for court-members by Article 25, UCMJ, 10 U.S.C. § 825, trial defense counsel made no effort to have the convening authority name a replacement. Both of the other challenges for cause related to knowledge about the crime or the crime scene, and not any particular disposition as to the death penalty. Since counsel understood that the conviction was a foregone conclusion, and neither of the two members challenged betrayed any unfavorable inclinations with respect to the death penalty, the challenges for cause defy rational explanation.

4. Our dissenting brethren are eloquent proof of the existence of officers who, although not inalterably opposed to the death penalty, nevertheless believe that appellant does not deserve it.

But why take a chance and reject a draw that may turn out to be that ace? Simple arithmetic tells us that the chances of finding such a person improve linearly with each additional individual placed into a pool. Each challenge of an individual "spots" the prosecution a vote, and becomes in essence, a vote for death. Instead of having to convince 13 people that appellant deserved death in three different votes, the government only had to convince 8, a considerably simplified task.[5]

Identifying members "hostile" to your cause is more art than science. The most skillful trial practitioner will concede that an exacting *voir dire* may at best give counsel a hunch, no more, of a given individual's predispositions or biases. A flourishing cottage industry among the civilian bar has sprung into existence in which psychologists and sociologists help trial attorneys pick jurors based upon profiles established according to age, ethnic groups, education, family background, and a host of other factors thought to be predictors of biases and proclivities. Challenging a prospective juror on this basis may be good enough *where the excused member will be replaced by another, possibly more sympathetic, candidate.* But where there is no replacement standing by, if there is even a 1 percent chance that a given individual will vote for life, there is everything (literally) to gain and nothing to lose by retaining that person on the court.

In recent years, the Supreme Court has recognized that there are constitutional implications which attach to the attributes of the traditional common law jury, and that variation of the number of jurors, or the requirement for unanimity, may be such as to vitiate the guarantees of the Fifth and Sixth Amendments. *Compare Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (six-person jury, unanimous verdict, constitutionally sufficient for non-capital cases) *with Ballew v. Georgia,*

435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978) (five-person, unanimous verdict, for misdemeanor cases, unconstitutional). *See also Burch v. Louisiana,* 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979) (less than unanimous verdict of six-member jury for non-petty cases impermissible); *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (upholding state statute providing for conviction for non-capital offenses by 10-to-2 majority); *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (no constitutional entitlement to conclusive determination of capital sentence by jury). Jury and group dynamic studies were an important component informing the holdings in *Williams* and *Ballew.* Particularly in the latter, the Supreme Court seemed to accept certain statistical conclusions strengthening the playing card analogy. Important among these conclusions was that, as jury size diminished, the reliability of the verdict suffered, *and the risk of convicting an innocent person rose. Ballew,* 435 U.S. at 234, 98 S.Ct. at 1036. *See* Friedman, *Trial by Jury: Criteria for Convictions, Jury Size and Type I and Type II Errors,* 26–2 AM. STAT. 21 (Apr.1972); Nagel & Neef, *Deductive Modeling to Determine an Optimum Jury Size and Fraction Required to Convict,* 1975 WASH. U.L.Q. 933. The obverse is also true—the risk of *not* convicting a guilty person increases with the size of the panel. *Id.* Another study concluded that the smaller the group, the less likely it is to overcome the biases of its members. Lempert, *Uncovering "Nondiscernible" Differences: Empirical Research and the Jury–Size Cases,* 73 MICH. L.REV. 643 (1975).

Other studies relied upon in *Ballew* revealed that the verdicts of jury deliberations in criminal cases will vary as juries become smaller, and that the variance amounts to an imbalance to the detriment of one side—the

---

**5.** It is an article of faith among the military defense bar that senior officers may have sufficient force of personality and inherent authority of rank to sway wavering members to their side, which may account for trial defense counsel's use of the peremptory challenge to eliminate the senior member after a challenge for cause failed. Compelling advocacy cuts both ways, of course, but it is also an article of faith that senior officers are disposed toward the prosecution. However, jury studies suggest that the effect of such biases is magnified the smaller the jury. They also reveal that those representing a "minority" viewpoint in a panel are more likely to be found the larger the jury panel, and are more likely to stick to their guns. *See* discussion, *infra.*

defense. Juries in criminal cases generally "hang" with only one or two jurors holding out for the defense. The larger the jury pool, the more likely it is to harbor the one or two dissenting votes. Remarkably, a minority viewpoint held by 10 percent of the population (such as a strong moral aversion to the death penalty, perhaps?) has only a 28.2 percent chance of going unrepresented in a 12–member jury, but more than half of 6–member juries could be expected to have no representative of that view at all. *See generally Ballew,* 435 U.S. at 234–36, 98 S.Ct. at 1036–37. The studies point ineluctably to one conclusion: for defendants in criminal cases, particularly capital trials, so long as unanimity is required, more is always better.

I cannot conceive, therefore, of any single thing appellant's counsel could have done more damaging to appellant's chances to escape the death penalty than to abet the diminution of his court-martial panel. Certainly, this blunder exceeds by an order of magnitude any errors in choosing not to present more of appellant's psychosocial history.[6]

Yet I conclude that it does not meet the *Strickland—Lockhart* standard. Counsel's performance in slashing his "jury" from 13 to 8 was deficient, no doubt. What's more, there can be no question but that the sacrifice of even one opportunity to get a "no" vote on any of the three votes requisite to a capital sentence prejudiced the appellant, even though, of course, we shall never know if any of the five challenged members might have supplied that invaluable dissenting vote. We do know, however, that even if all five had voted as did the remaining eight, appellant would be in no worse position than he is today.

If, in the harsh glare of hindsight, counsel's error is magnified, it is nevertheless understandable. From time immemorial fledgling judge advocates are taught about the "numbers game," a feature of criminal jurisprudence unique to the military justice system because only a two-thirds majority suffices to convict in all but capital cases. Thus, goes the folklore, a panel of five members optimizes the situation for an accused, because the necessity to round to the nearest member imposes a correspondingly greater burden of 80 percent (4 of 5 are needed to convict) on the prosecution. Correspondingly, any number divisible by 3 is optimal for the prosecution because it means it must get *no more than* the precise two-thirds needed for a conviction. Bounded by these ambient constraints, counsel for both sides struggle to eliminate from a court-martial panel those individuals they believe are least sympathetic to their cause while simultaneously arriving at an overall number which maximizes the chances for their respective client. Within this jurisprudential subculture, stereotyping and normative judgments run wild. First sergeants and squadron commanders are bad news for defendants. The more senior a member, the more inclined to convict. The better educated a member, the more likely to be receptive to the adverse social or economic circumstances of an accused. None of these generalities are airtight, nor, to my knowledge, is there even any empirical evidence supporting them. But they do reflect the conventional wisdom of the military bar. The problem in this case is that appellant's military counsel applied the common paradigm to an uncommon situation. With the requirement of unanimity, everything changes.

Similarly, in civilian practice, *voir dire* serves to identify, and thence to eliminate by challenge, potential adverse jurors from a large venire. But a critical distinction is that those members challenged off *are replaced.* A defendant considering challenging a juror can be assured that the decision to do so will not correspondingly reduce the size of his jury.

Considering the background, experience, and training of both the civilian and the military practitioners in appellant's corner, it was "natural" to go through a spirited *voir*

---

6. Scrutiny of appellant's family background and psychological profile was freighted with grave peril. I agree with the lead opinion's conclusion that, had trial defense counsel embarked on such a project, we would be examining the issue of ineffective assistance of counsel from the other side of the magnifying lens, from whence it would have loomed much larger.

*dire* followed by a challenge process familiar to both sides. But in the peculiar circumstances of capital procedure under the UCMJ, this process not only did their client no good, but manifestly had the potential to do much harm.

The seminal case of *Strickland* established a deceptively straightforward test for determining whether a defendant was afforded effective assistance of counsel. Appellant must show first that his counsel's performance was deficient—so bad that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Second, the deficiencies of counsel must be so serious as to deprive appellant of a fair trial, "a trial whose result is reliable." *Id. See also United States v. Ingham,* 42 M.J. 218, 223 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996). *Lockhart* served notice as to just how bad counsel's performance had to be, and how serious the prejudice. It was insufficient even to show that a mistake might have been outcome-determinative. More was demanded of appellate courts, who must look to whether "the result of the proceeding was fundamentally unfair or unreliable. . . ." *Lockhart,* 506 U.S. at 369, 113 S.Ct. at 842.

Even though counsel's actions carried the *potential* to imperil his cause, no constitutional or statutory entitlement was sacrificed. Instead, counsel drained a pool of 13 members down to 8, knowing all the while there was only a dim prospect that the challenge process would reduce the panel below the statutory minimum of 5 members. Until that happened, challenged members would leave an empty seat in the courtroom, one less individual for the prosecution to worry about. By contrast, counsel's error in *Lockhart* was not only prejudicial in the abstract, but in actuality. Even so, it did not meet the Supreme Court's test of ineffectiveness. Unlike the situation in *Lockhart,* I cannot say with any certainty that counsel's performance was even outcome-determinative, and

can only speculate whether any of the absent 5 members might have proven to be the precious ace. Neither do I think the acts or omissions on counsel's part "were outside the wide range of professionally competent assistance." [7] Certainly counsel's failure to grasp the possibly decisive benefit to their client of a larger pool of members looms large, but it falls well short of the error made by counsel in *Lockhart.* I conclude, therefore, that counsel's performance, while deficient, was not so egregiously so as to entitle appellant to a new trial.

HEIMBURG, Senior Judge (concurring and dissenting):

I agree with the majority in the resolution of all issues in this case save one—the sentence to death. I believe that neither the evidence nor the Constitution supports finding an aggravating factor which justifies the death penalty for Senior Airman Jose Felnar Santander Simoy.

With due respect, I believe the majority statement of the facts in this case leaves a faulty impression. The court members found Airman Simoy guilty of felony murder only as a conspirator to a robbery. The evidence showed conclusively that Airman Simoy did not murder, attempt to murder, or plan to murder anyone during the robbery. Thus, the death penalty adjudged may be approved if, and only if, Airman Simoy was a major participant in the robbery who had an intent to kill or such "reckless disregard for human life . . . [by] engaging in criminal activities known to carry a grave risk of death." *Tison v. Arizona,* 481 U.S. 137, 157, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987). *See Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3379, 73 L.Ed.2d 1140 (1982) (death penalty for a felony murder participant requires that the person "killed or attempted to kill . . . or contemplated that life would be taken"). By focusing on Airman Simoy's central position in the planning and execution of the armed robbery, the majority opinion

7. The arithmetic implication of what was going on with the court panel size was obviously lost on the prosecutor as well, who stoutly resisted all challenges, with the lone exception of MSgt Bowdren. Like the rest of the trial attorneys in this case, he operated from a familiar, but wholly inapplicable, methodology. Neither did this issue receive any attention from appellate defense counsel, despite the invitation of this Court at oral argument.

effectively avoids careful scrutiny of this essential factor.

In *Enmund*, the two elderly victims were shot during a robbery at their home. Earl Enmund's only involvement in the crime was as driver of the "getaway car." He was not present in the victims' home when the fatal shots were fired. The Supreme Court's focus was "not the disproportionality of death as a penalty for murder, but the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims." 458 U.S. at 798, 102 S.Ct. at 3377. The majority found no justification for the premise that "death occurs so frequently in the course of armed robberies that the death penalty should be considered a justifiable deterrent" to armed robbery. In fact, finding that "the death penalty is rarely imposed on one only vicariously guilty of murder," they reversed Enmund's death sentence.

The *Tison* case presented a much higher level of involvement, according to the Supreme Court—sufficient to justify the death penalty. Neither Ricky nor Raymond Tison fired the shots that killed the four members of an Arizona family. Their death sentences were upheld, however, since they put into motion the lethal series of events—the "jailbreak" of their father and another convicted murderer—which led to deaths of the victims. Both Tisons could foresee that lethal force might be used when they attempted the escape. Raymond admitted he was prepared to kill, if needed, to help his father and the other convicted murderer escape. Both brothers enabled known killers to kidnap an innocent family and, after the victims were shot, chose to help the killers make their escape rather than assist the victims. The brothers' participation in the kidnapping-robbery was "substantial" and their conduct demonstrated a "reckless indifference to human life." 481 U.S. at 158, 107 S.Ct. at 1688.

The Constitutional requirement enunciated in *Enmund* and *Tison* is the basis for R.C.M. 1004(c)(8), the only aggravating factor authorizing the death penalty in this case. R.C.M. 1004(c)(8) is a Presidential prescription which carefully follows the language of the *Enmund* and *Tison* holdings. It authorizes the death penalty when:

> [T]he accused was the actual perpetrator of the killing or was a principal whose participation in the burglary, sodomy, rape, robbery, or aggravated arson was major and who manifested a reckless indifference for human life.

Unlike the majority, I believe that the court-martial below misapplied R.C.M. 1004(c)(8) to the facts of this case. There is no doubt that Airman Simoy was a "major participant" in the robbery. What is decidedly unclear is whether the evidence proves Airman Simoy showed a "reckless indifference for human life." I do not believe it does.

The *Hatch* case, relied upon so heavily by the majority in justifying how a "nontriggerman" can lawfully be sentenced to death when the actual killer "gets life," contained facts even further along the "culpability spectrum" than the involvement of the Tison brothers—or Jose Simoy. Steven Hatch and Glen Ake entered an isolated house intending to rob the occupants. Both held firearms. They bound and gagged Reverend Richard Douglass, his wife, Marilyn, and their son, Brooks, while they attempted to rape the Douglass's twelve-year old daughter. Then Hatch covered the heads of all four Douglass family members with an article of clothing. At Ake's direction, he went back to the car to "wait for the sound." Ake then shot each member of the Douglass family. The parents both died. As the trial judge observed, Steven Hatch's involvement in the murders of Reverend and Ms. Douglass and the attempted murder of their two children was "heinous, atrocious and cruel":

> When the law talks of torturing people, that doesn't mean you have to put them on the rack or twist their arms or something. I can't think of anymore [sic] torture than to tie a man and a woman up, hog-tie them where they can't move and at the same time while they're laying there waiting to be shot, they listen to their twelve-year-old daughter crying and pleading not to be raped by two grown men.

*Hatch v. Oklahoma*, 58 F.3d 1447, 1468 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996).

If Steven Hatch had been tried by court-martial, the presence of the R.C.M. 1004(c)(8) aggravating factor would have been easily proven beyond a reasonable doubt. Having helped tie up the victims and blindfold them, when Hatch left the house to get the car ready for escape he knew or should have known that Ake planned to shoot the victims ("wait for the sound") after he left. Hatch demonstrated more than "reckless indifference for human life"—his cooperation with Ake showed he shared Ake's intent. It is not surprising that Hatch's death sentence was upheld through numerous appeals and collateral attacks, finally ending in his recent execution.

Unfortunately for the majority, the *Hatch* case is not the *Simoy* case. As I've observed above, the majority spends most of its ammunition on the issue of whether Airman Simoy was a "major participant" in the robbery. That is not at issue here. Airman Simoy was certainly the "mastermind" of an armed robbery; its "commander-in-chief," to use the term applied by the majority opinion. He planned it, chose his band of robbers, and insisted that some of them bring weapons: a rifle, pistol, and pipe. The fact that Airman Simoy was the mastermind of the robbery satisfies only one prong of this aggravating factor: that he was a major participant in the felony. It does not show that he was recklessly indifferent to human life.

The majority finds reckless indifference for human life in the fact that Airman Simoy planned an aggravated assault in furtherance of the robbery. They say, "most people know that substantial physical harm may occur when you strike someone in the head with a lead pipe hard enough to 'knock him out.' " This logic is the sort of argument the Supreme Court found wanting in *Tison:*

> The Arizona Supreme Court wrote:
>> "Intend [*sic*] to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." 142 Ariz., at 456, 690 P.2d, at 757.
> This definition of intent is broader than that described by the *Enmund* Court.

> Participants in violent felonies like armed robberies can frequently "anticipat[e] that lethal force ... might be used ... in accomplishing the underlying felony." Enmund himself may well have so anticipated. Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves. The Arizona Supreme Court's attempted reformulation of intent to kill amounts to little more than a restatement of the felony-murder rule itself.

*Tison,* 481 U.S. at 150–51, 107 S.Ct. at 1684. The majority, I believe, falls into the same trap as the Arizona Supreme Court in its use of the foreseeability of bloodshed in this armed robbery to justify the death penalty for a felony murderer who did not kill or intend to kill. The fact that everyone knows the victim of an aggravated assault might die does not supply the necessary "reckless disregard for human life" required by *Tison* and R.C.M. 1004(c)(8).

Apart from Airman Simoy's position as "commander-in-chief" of the armed robbery, the majority points to three facts to show Airman Simoy's indifference for human life. First is Wolford's testimony that Airman Simoy said about the escort, "If the guy dies, he dies." Second is Wolford's testimony that Airman Simoy said nothing when one of the gang members said out loud, while the group was sitting in the car, they would have to kill everyone so they won't talk. Third is Airman Simoy's "command" to kill Technical Sergeant Marquardt, the innocent bystander. The problem with this evidence is that it doesn't compel the conclusion the majority reaches.

Wolford puts in Airman Simoy's mouth a statement ("if he dies, he dies") that simply doesn't match the rest of the evidence about Airman Simoy's plan for the robbery. All evidence of the robbery plan shows that Airman Simoy took precautions to avoid killing anyone during the robbery. For example, he tried to ensure that no shots would be fired, even though he was apparently not concerned that shots would attract security police attention. He planned for Che Wolford

simply to point his rifle at the two robbery victims in an attempt to "freeze" their movement until his brother, Dennis Simoy, could knock the security police escort unconscious with a pipe. Jesus Ramos testified that no one was supposed to be killed during the robbery.

Airman Simoy's non-response to a nervous, excited outburst ("we'll have to kill them all") does not show what the majority infers: that he agreed with the comment. The robbery plan did not call for killing anyone, and Airman Simoy made no changes to the plan at that late stage. (When the comment was made, the robbers were in the car at the scene.) It is more reasonable to infer from Airman Simoy's silence that he did not take this comment seriously than it is to infer that he agreed with the thought.

Finally, Wolford's testimony about the "kill him" statement does not relate to the killing of Sergeant LeVay. It does not show what the majority infers from it—that Airman Simoy intended to kill someone during the robbery. To place Wolford's testimony in the proper context, we should recall that he also told the court he was *surprised* to learn that Dennis had killed Sergeant LeVay. That one of the key members of the robbery team, the one who held the rifle pointed at Sergeant LeVay, was surprised that Sergeant LeVay was killed, says more about the robbery planner's intentions than the three comments used by the majority.

The death of any crime victim is a reprehensible event. Airman Simoy is liable for Sergeant LeVay's senseless death under the felony murder rule, Article 118(4), UCMJ, 10 U.S.C. § 918(4) (1988). The evidence in this case shows Airman Simoy led a robbery which went tragically awry. In my view, however, the majority opinion justifies the death penalty for Airman Simoy based entirely on his being the "commander-in-chief" of that robbery. American Constitutional principles require more. Courts must differentiate among those people responsible for murder, giving the death penalty only to

those whose conduct truly justifies it. *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). This is not such a case.

DIXON, Chief Judge (dissenting):

Jose F.S. Simoy did not kill anyone. Nor did he plan anyone's death. Sergeant Stacy E. LeVay is dead, but not because the armed robbery was carried out as appellant planned it.[1] However, it is true that the armed robbery which appellant planned and helped to carry out resulted in Sergeant LeVay's untimely death. Given those facts, does appellant's culpability warrant the imposition of the ultimate penalty of death? From my perspective, that is the overriding issue. The majority answers the question in the affirmative. I cannot agree. When I compare this case with other death penalty cases that have been prosecuted by the military, I can only conclude that, under these circumstances, the sentence to death is inappropriate, both legally and factually.

It has been more than 13 years since this Court has last been called upon to decide upon the appropriateness of a death penalty. *United States v. Gay,* 16 M.J. 586 (A.F.C.M.R.1983) (airman who killed two security policemen with an M–16 rifle had his death sentence overturned on constitutional grounds). In the last 40 years, not a single Air Force member has been executed pursuant to a court-martial sentence.[2] There are numerous reported cases in which Air Force members have been convicted of murder. A number of them have involved particularly gruesome killings which clearly warranted the maximum possible sentence. Yet, all of them have resulted in no greater punishment than life imprisonment. Consequently, there are no published Air Force cases which will assist us in determining sentence appropriateness in this case.

I write separately to explain how I differ from the majority opinion in three crucial areas. First, I am not satisfied that appellant was accorded effective representation of

---

1. The plan was for Dennis Simoy to knock the escort out by hitting him in the head but not for him to "bludgeon" the guard to death after the initial blow.

2. The last three Air Force executions occurred in the early 1950s.

counsel during the sentencing portion of his trial. Next, I believe appellant was unfairly prejudiced by the military judge's ruling precluding the defense from making any reference to the prosecution of appellant's brother. Finally, I am not persuaded that this is the type of felony murder that warrants or permits the imposition of the death penalty.

Even if I could join the majority in its conclusion that this death penalty is appropriate, I would still vote to remand the case for a rehearing on the sentence because of ineffective assistance of counsel. I have never seen a case in which the ineffectiveness of counsel was more blatantly obvious. From the defense's perspective, this was solely a sentencing case. They never seriously questioned appellant's guilt. Once the decision was made to refer this as a capital case, clearly the dominant defense focus was, or should have been, to preclude the death penalty. Particularly disturbing to me, given that focus, is the fact that in a record of trial that consumes 1383 pages, the entire defense submission during the sentencing portion covers a mere 7 pages. All that was submitted was an affidavit from Lieutenant Colonel Suchenski that appellant had offered to plead guilty, a written unsworn statement signed by the appellant, and a short oral statement made by the civilian defense counsel stating little more than the fact that appellant had a wife and three kids. Not a single witness was called on appellant's behalf and virtually no effort was made to humanize appellant in the eyes of the panel members. Such paucity in the sentencing portion of a capital case, particularly when the accused neither planned nor inflicted the death, can only be viewed as appalling.

I take issue with the majority's conclusion that the defense had a "viable" strategy for avoiding the death penalty. If the defense team had a strategy during the sentencing portion of the trial, it is not discernible by me. At most, the defense appeared to rely on a "hope" that defendant would not be sentenced to death because he was not the triggerman. A "hope" is not a "strategy." When I read the majority opinion, I am unpersuaded by the attempt to find a reasonable strategy from the sparse sentencing presentation. I'm reminded of that old adage which goes, "you can't make a silk purse from a sow's ear." While the law pertaining to effective assistance of counsel does not require defense counsel to construct a "silk purse" to be effective, the law does require counsel to meet an objective standard of reasonableness. *United States v. Lawson*, 40 M.J. 475 (C.M.A.1994). I cannot dignify the way defense counsel handled the mitigation portion of the trial by calling it reasonable. It is hard for me to see how anyone reviewing this case could conclude that the failure to call any live witnesses to testify in appellant's behalf was reasonable. It might be reasonable if appellant were only facing a punitive discharge, but hardly when the client faces death.

Unlike the majority, I cannot casually dismiss the affidavits filed by the two military defense counsel admitting ineffectiveness by the defense team. I believe these affidavits go far beyond "Monday morning quarterbacking" about bad tactical decisions.[3] Rather, they confirm my conclusion that the defense team did not have a strategy for mitigation. They establish that the defense team was in a state of disarray. Let me make it clear that I reject any suggestion that they were ineffective because they simply lacked experience in capital murder cases. But one does not need experience in capital murder cases to know that competent counsel would have "developed a theme for presenting matters in mitigation." This is something that military defense counsel routinely do in every court-martial, particularly when sentencing is inevitable. That's why the two military defense counsel know and admit that the defense team performance in this case does not pass professional muster.[4]

The majority contends that my concern is based on the quantity of the defense presentation alone. Not so! It is also the lack of

3. The law is clear that differences of opinion among the defense team concerning tactical decisions does not support a claim of ineffectiveness of counsel.

4. The affidavits establish that the two defense counsel played subordinate roles to the civilian defense counsel, particularly in the decisions regarding mitigation evidence.

substance which left the defense team helpless to counter the prosecution's grim picture of appellant that deeply troubles me.[5] The majority opinion finds that the defense team "made a well-thought out tactical choice to limit the defense presentation." How can the failure to call a single live witness be called a tactical choice in this case? What "devastating counterattack" was the defense team trying to avoid? The prosecution had already produced an Article 15 and a letter of reprimand which the appellant had received. The only rationale I can find for the failure of the defense team to call any member of appellant's family was a reference in Captain Bemis' affidavit. He recalled that Mr. Trapp was concerned "about the quality of witnesses" they would make.

We need not speculate whether the defense team could have done anything to "humanize" appellant in the eyes of the members. In the record of trial, this Court has before it the videotape of appellant's family members which was offered with his post-trial clemency presentation. Although the videotape was prepared prior to trial, the court members never heard the family members' comments. The lead opinion (citing *Strickland v. Washington* and *Burger v. Kemp*[6] ) notes that a defense team may tactically choose not to put on any mitigation evidence. As those cases clearly hold, when there is a tactical reason for failing to present mitigation evidence, such an omission does not constitute ineffective assistance of counsel. Here we have a much different situation. The failure of the defense team to present any mitigation evidence about appellant's background, values, family life, and character provided nothing to combat, balance or soften the damaging characterizations made during the prosecution sentencing arguments. They neglected to present any portrayal of appellant which would have countered words like "coward," "evil, greedy vicious murderer," "savage criminal," and "he is simply an evil man." Inexplicably, members never heard appellant's children, wife, sister and mother say their videotaped comments: "I miss my Daddy," "I love my Daddy," "he helps me do my homework," and *"he is not a killer."*

I suggest the deficiencies of this defense team during the sentencing phase were no less egregious or potentially damaging to our system of justice than a failure of counsel to investigate a client's defense of alibi. *See United States v. Scott,* 24 M.J. 186 (C.M.A. 1987). The breakdown in the development of a mitigation strategy deprived this appellant of the type of adversarial process that our system counts on to produce just results. *See United States v. Mansfield,* 24 M.J. 611, 618 (A.F.C.M.R.1987). The majority opinion suggests that the meager mitigation presentation was designed to minimize unfavorable rebuttal. That rationale doesn't hold water. What conceivable unfavorable rebuttal evidence was there which would justify the failure to call a single mitigation witness? The answer is none.

Under the *Strickland* standard, finding unreasonable performance is not enough to justify a remand of appellant's case. There is also the requirement that appellant be prejudiced by the defective performance. I have no difficulty finding prejudice in this instance. I am not convinced that the result would have been the same if a proper mitigation presentation had been made. I believe the defense performance was so deficient that the adjudged sentence cannot be viewed as a *reliable* result.

We have a military system of justice that is widely acclaimed for fairness and equality of treatment. Our concern for equal justice is one of the reasons we provide free legal counsel to every accused. However, simply providing counsel is not enough. Ineffective assistance of counsel may be worse than no counsel at all. That's why the affidavits of the two military counsel asserting that the

---

5. A portion of Captain Bemis' affidavit reads as follows: "Our plan was to extenuate the crime, but very little effort, over the six or seven months we had, went into gathering or preparing any mitigating evidence which would humanize Airman Simoy or counter the prosecution's picture of him."

6. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

defense team was ineffective must be seen as placing an indelible cloud over this case. Can we honestly look at the bare mitigation evidence in the light of these affidavits and conclude that the record establishes that the defense team was effective during the mitigation stage? This judge cannot. Like the view expressed by Judge Gierke in his separate opinion in *United States v. Curtis*, 44 M.J. 106, 171 (1996), I am not satisfied that this appellant received the representation during the sentencing stage that the Constitution requires and a member of our armed forces facing a sentence of death deserves. A rehearing on sentence is needed to correct this deficiency.

I also take issue with the majority's conclusion regarding the military judge's ruling which precluded the defense from presenting any evidence or comments concerning Dennis Simoy's potential sentence. The only reason appellant was facing the death penalty in this case was because of the actions of his brother, Dennis. It was Dennis that "bludgeoned" Sergeant LeVay to death, not appellant. What legal justification can there be for the conclusion that the members, who were told what role Dennis played in the crime, should not be told that Dennis was not subjected to the death penalty? In regard to capital cases, R.C.M. 1004(b)(3) provides as follows: "The accused shall be given broad latitude to present evidence in extenuation and mitigation." I cannot reconcile this principle with the judge's ruling precluding the accused in extenuation from informing the members that the actual killer was not subject to capital punishment.

Can anyone seriously argue that appellant who planned the robbery is more deserving of the death penalty than the actual killer? Is it logical to conclude that the punishment imposed upon the actual killer is not relevant when felony murder is the sole basis for a capital prosecution? The rationale provided by the military judge for precluding the members from knowing that Dennis Simoy was not subjected to the death penalty was his finding that such relevant information under MIL.R.EVID. 403 was outweighed by the danger of undue prejudice, confusion or waste of time. It appears that all the de-

fense wanted to do was to have appellant make the following statement: "The United States government has tried and convicted my brother for actually killing Sergeant LeVay and yet he will not suffer the death penalty." That statement would have been short, clear and factually accurate. Moreover, in my view, it was a statement that appellant had a constitutional right to present as extenuation and mitigation. I submit it is highly likely, if not probable, that at least one member would have voted against the death penalty if they had known Dennis Simoy had escaped the death sentence. *See McKoy v. North Carolina*, 494 U.S. 433, 436–38, 110 S.Ct. 1227, 1230–31, 108 L.Ed.2d 369 (1990) (as long as any reasonable juror might use the evidence to vote for life versus death, it is error for the court to exclude the evidence).

The majority opinion suggests that appellant should not be allowed to present evidence that his brother would not face the death penalty because, if the contrary were true, the government would have been precluded from introducing evidence that he had received the death penalty. The suggestion that the rights of the government and defense are balanced has no support in law or fact. Can a government witness make an unsworn statement? Does R.C.M. 1004(b)(3) apply with equal force to both the government and the defense? Obviously not!

The majority also upholds the trial judge's ruling on the grounds that he prevented the members from engaging in sentence comparison. They reason that the law does not permit the sentence received by one co-conspirator to be admitted at the trial of another. There are problems with the majority's rationale on this point. First, appellant was not charged with conspiracy to murder—he was charged with felony murder. Second, he was not attempting to discuss the disposition of his brother's case for purposes of sentence comparison, but rather to show the great disparity in the maximum authorized punishments solely as a result of his brother being a civilian. Third, there is an important element that ties Dennis Simoy's offense to the punishment which appellant was subjected. But for the fatal blows which Dennis inflicted

upon Sergeant LeVay, appellant could not have been subjected to a capital prosecution. Fourth, the only sentencing discretion which the members had in this instance was whether the death sentence was appropriate. I can think of no justification for denying the right of an accused to inform those who must decide his fate of the simple fact that the person who actually committed the killing could not and would not face the death sentence. In my view, appellant had a constitutional right to tell the members that he faced the death penalty for this crime only because, unlike the actual killer, he was a member of the armed forces. Finding prejudicial error in the military judge's ruling on this point, I would authorize a rehearing on sentence.

Finally, I turn to the crucial question of whether the death sentence is appropriate in this case. I cannot join my colleagues in the majority in concluding the adjudged sentence in this case is correct in law and fact. First, I disagree because I do not believe that, under the circumstances of this case, appellant's sentence to death is constitutionally permissible. Such a conclusion will moot the issues of ineffectiveness of counsel during the sentencing stage and whether the military judge erred in excluding any reference to Dennis Simoy's prosecution. The Eighth Amendment requires, among other things, that there be a scheme to "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Loving v. United States,* —— U.S. ——, ——, 116 S.Ct. 1737, 1742, 135 L.Ed.2d 36 (1996), quoting *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988).

The Supreme Court in *Loving* has already addressed the constitutionality of the circumstances before us in this case. The following language leaves no doubt that this death penalty could not withstand a constitutional challenge:

> Article 118 authorizes the death penalty for but two of the four types of murder specified: premeditated and felony murder are punishable by death, whereas intentional murder without premeditation and murder resulting from wanton and dangerous conduct are not. The statute's selection of the two types of murder for the death penalty, however, does not narrow the death-eligible class in a way consistent with our cases. Article 118(4) by its terms permits death to be imposed for felony murder even if the accused had no intent to kill and even if he did not do the killing himself. The Eighth Amendment does not permit the death penalty to be imposed in those circumstances. *Enmund v. Florida,* 458 U.S. 782, 801 [102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140]....

*Loving v. United States,* —— U.S. at ——, 116 S.Ct. at 1742.

The majority opinion makes a strong case for appellant's culpability, stressing that appellant was the one who "masterminded" the armed robbery and was its "commander-in-chief." It describes appellant as the "engineer of the train of death which crushed the life from Sergeant LeVay's body" and argues that "appellant's grip on the lead pipe which struck the fatal blows was as tight as his brother's, if not more so." In so doing, the majority ignores the simple fact that appellant does not fall within the group of murderers who may be put to death under the military's "narrowing" scheme. In effect, they attempt to use the aggravating factors to "broaden" the group of murderers who may be put to death to include appellant.

The sole purpose of the aggravating factors is to narrow the group of murderers eligible for the death penalty so as to impose the ultimate punishment only in those instances when it is most justified. Article 118, UCMJ, narrows the group of murderers who may receive the death penalty within the military. Included in that group are those convicted of premeditated murder and felony murder. Anyone convicted of premeditated murder is subject to the death penalty. However, only those premeditated murderers "convicted" of one of the aggravating factors beyond a reasonable doubt may actually be executed. Unlike those convicted of premeditated murder, not everyone convicted of felony murder may constitutionally be subjected to the death penalty. In *Loving,* the

Supreme Court reiterated that the Eighth Amendment would not permit the death penalty for a felony murderer who "did not do the killing himself" or who "had no intent to kill." In order for the aggravating factors to apply in the military to felony murderers, the accused must have actually killed or had the intent to kill. The aggravating factors determine which of those felony murderers may actually be executed. Since appellant does not fall within the group of felony murderers who may be subjected to the death penalty, his sentence to death is constitutionally impermissible.

In light of *Enmund*, R.C.M. 1004(c)(8) must be read as it is written. By its language, it applies only when the accused is the actual perpetrator of the killing or is a "principal" to the killing. In order to be a principal to the killing, under Article 77, UCMJ, an accused must "share in the criminal purpose [or] design." MANUAL FOR COURTS-MARTIAL (1984), Part IV, ¶ 1b(2)(b)(ii). As an aggravating factor, R.C.M. 1004(c)(8) applies only in those situations of felony murder in which the death penalty is permissible; namely, when the accused is the perpetrator or has the intent to kill. If "principal" were read, as the majority presumably reads it, to mean "principal to the felony," application of the aggravating factors could lead to absurd results. For example, a premeditated murderer, generally considered the most culpable of all murderers, might escape the death penalty in the absence of additional aggravating factors. On the other hand, if R.C.M. 1004(c)(8) were read to mean "principal to the robbery," a major participant in a robbery, like appellant, could receive a death penalty although he killed no one, planned to kill no one, and intended to kill no one. Under such an interpretation, R.C.M. 1004(c)(8) could scarcely be viewed as legitimately narrowing the group of murderers subject to the death penalty and it most certainly would not comply with the principles set forth in *Enmund* or *Loving*.

To the extent that the majority uses the Supreme Court's decision in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95

L.Ed.2d 127 (1987) to bring appellant within the group of felony murderers who may receive the death penalty, I believe it ignores the narrowing scheme which the military has adopted. *Tison* only speaks to the specific narrowing scheme which has been adopted by a minority of jurisdictions, like Arizona.[7] It is not surprising, therefore, that the Supreme Court decision in *Loving* makes no reference to *Tison*.

The Supreme Court has never held that the death penalty for premeditated murder violates the Eighth Amendment. Neither has the Supreme Court held that the death penalty violates the Eighth Amendment when a felony murderer actually does the killing or intends that one be killed. However, both *Enmund* and *Loving* make it clear that the Eighth Amendment does not permit the death penalty for someone, like appellant, who neither killed anyone or intended that anyone be killed. Because appellant neither did the killing nor intended the killing, it is simply not possible to reconcile the appellant's death sentence with either *Enmund* or *Loving*.

Lastly, even if the death penalty were permissible in this case, I would have concluded, under Article 66(c), UCMJ, that appellant's sentence is inappropriate. In this country, this is not the type of murder that results in an execution. It is certainly not the type of intentional gruesome slaying that warrants the first Air Force execution in over 40 years. Article 66(c) gives this Court unique appellate review authority. It should be used to preclude unjust results. This is such a case. I have found no reported case in *any* U.S. jurisdiction in which an accused has been sentenced to the death penalty when the actual perpetrator was not also tried for capital murder. Not a single one. The reason is rather obvious: it would violate our sense of basic fairness. If "equal justice under the law" means anything, I trust it means that one who did not plan, intend, or commit a killing will not be sentenced to death by a government that decides not to capitally prosecute the one who actually did the killing. Again, I say Jose F.S. Simoy did

---

**7.** Despite the Supreme Court holding that the death penalty would be permissible, upon remand, both of the Tison sentences to death were commuted to life.

not kill anyone. To take his life under the facts of this case would be unjust. His brother, who killed Sgt LeVay, did not even face the death penalty. This disparity not only makes appellant's sentence inappropriate, it makes it grossly unfair.

OFFICIAL

ROXANE M.G. PORTER Staff Sergeant, USAF Chief Court Administrator

## APPENDIX

I. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT AND MILITARY DUE PROCESS

II. THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING AIRMAN SIMOY'S MOTION FOR APPROPRIATE RELIEF (NONCAPITAL REFERRAL) WHICH ALLEGED THE CONVENING AUTHORITY IMPROPERLY REFERRED AIRMAN SIMOY'S CASE AS CAPITAL

III. THE MILITARY JUDGE ERRED IN HIS DENIAL OF APPELLANT'S REQUESTS REGARDING THE ARTICLE 32 INVESTIGATION

IV. THE MILITARY JUDGE ERRED IN HIS DENIAL OF AIRMAN SIMOY'S MOTION TO COMPEL DISCOVERY

V. THE MILITARY JUDGE ERRED IN HIS DENIAL OF APPELLANT'S MOTION FOR APPROPRIATE RELIEF (REFERRAL PROCESS OF CAPITAL CASES RENDERS DEATH PENALTY ARBITRARY AND CAPRICIOUS)

VI. THE MILITARY JUDGE ERRED IN HIS DENIAL OF APPELLANT'S MOTION FOR APPROPRIATE RELIEF (ADMINISTRATION OF CAPITAL CASES RENDERS DEATH PENALTY ARBITRARY AND CAPRICIOUS)

VII. THE MILITARY JUDGE ERRED IN HIS DENIAL OF APPELLANT'S MOTION *IN LIMINE* TO EXCLUDE PRIOR ACTS OF UNCHARGED MISCONDUCT BY APPELLANT

VIII. THE MILITARY JUDGE ERRED BY GRANTING PART OF THE PROSECUTION'S MOTION *IN LIMINE* TO EXCLUDE CROSS–EXAMINATION, TESTIMONY, OR EVIDENCE CONCERNING DENNIS SIMOY'S CRIMINAL TRIAL

IX. THE MILITARY JUDGE ERRED IN IMPROPERLY LIMITING APPELLANT IN HIS SUBMISSIONS IN MITIGATION AND EXTENUATION BY INTERPRETING ARTICLE 45 AS PROHIBITING APPELLANT'S PLEA OF GUILTY TO CHARGES I, III, & IV

X. APPELLANT IS ENTITLED TO REPRESENTATION BY COUNSEL QUALIFIED UNDER THE AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ON APPEAL AND TO UNINTERRUPTED CONTINUITY OF COUNSEL UNAFFECTED BY PEACETIME MILITARY PERSONNEL DECISIONS

XI. CHARGES II–IV ARE MULTIPLICIOUS FOR FINDINGS AND SENTENCING IN AS MUCH AS THEY WERE PART OF ONE CONTINUOUS COURSE OF CONDUCT PROHIBITED BY CHARGE II (FELONY MURDER)

XII. AIRMAN SIMOY DID NOT KNOWINGLY AND INTELLIGENTLY INVOKE HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(b)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE THE MILITARY JUDGE MISLED APPELLANT BY STATING THAT HIS COUNSEL WERE "QUALIFIED LAWYERS" WHEN NONE OF THE COUNSEL HAD TRIED A CAPITAL CASE, RECEIVED ANY DEATH PENALTY CONTINUING LEGAL EDUCATION, OR PROPERLY PREPARED FOR THIS CAPITAL CASE

XIII. ARTICLE 18, U.C.M.J. AND R.C.M. 201(f)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT

XIV. APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A GRAND JURY PRESENTMENT OR INDICTMENT

XV. ARTICLE 25(c)(1)'S EXCLUSION FROM COURT–MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT AS THE ACCUSED INJECTS AN IMPROPER CRITERION (ENLISTED STATUS) IN SELECTING THE MEMBERS POOL

XVI. COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS ARTICLE III RIGHT TO A JURY TRIAL

XVII. THE CONVENING AUTHORITY DID NOT UNDERSTAND THE LAW AND HIS OPTIONS (INCLUDING DETAILING AN ALL–ENLISTED COURT AND RANDOM SELECTION OF MEMBERS FOR HIS FURTHER SCREENING) REGARDING DETAILING ENLISTED MEMBERS PURSUANT TO ARTICLE 25

XVIII. THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DO NOT PERMIT, IN PEACETIME, A CONVENING AUTHORITY TO HAND–PICK MILITARY SUBORDINATES, WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL, AS MEMBERS TO DECIDE A CAPITAL CASE FOR OFFENSES THAT OCCUR ON A MILITARY BASE BUT WHERE THERE IS CONCURRENT JURISDICTION WITH FEDERAL AUTHORITY

XIX. COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND AN IMPARTIAL CROSS–SECTION OF THE COMMUNITY

XX. THE GOVERNMENT MAY NOT MAKE A *WITHER-SPOON* CHALLENGE AFTER THE CONVENING AUTHORITY EXERCISES HIS ARTICLE 25 STATUTORY RESPONSIBILITY IN DETAILING MEMBERS

XXI. THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS–MARTIAL
WHEN HE GRANTED THE TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY'S ARTICLE 25(d) STATUTORY AUTHORITY TO DETAIL MEMBERS OF THE COURT

XXII. THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM VIOLATES THE FIFTH AND EIGHTH AMENDMENTS IN CAPITAL CASES WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE, CONTRARY TO THE DICTATES OF *MORGAN v. ILLINOIS,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), WHICH AUTHORIZED VOIR DIRE ON A POTENTIAL JUROR'S UNWILLINGNESS TO CONSIDER A LIFE SENTENCE

XXIII. TRIAL DEFENSE COUNSEL WERE INEFFECTIVE IN THEIR FAILURE TO OBJECT TO PROSECUTION EXHIBIT 20, A COLOR PHOTOGRAPH FROM BASIC TRAINING OF SGT LEVAY IN HIS SERVICE DRESS AND WHEEL CAP, WITH THE AMERICAN FLAG IN THE BACKGROUND, BECAUSE THE PHOTOGRAPH SERVED NO PROBATIVE PURPOSE WHATSOEVER, IMPERMISSIBLY INFLAMED THE MEMBERS, AND IRREPARABLY PREJUDICED APPELLANT'S TRIAL, ESPECIALLY WITH REGARD TO SENTENCING, WHERE THE ADMISSION OF THE PHOTOGRAPH WORKED TO CAUSE THE COURT MEMBERS TO IMPOSE THE DEATH PENALTY IN VIOLATION OF THE EIGHTH AMENDMENT

XXIV. THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS DENIED AIRMAN SIMOY DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL MEMBERS' CONSIDERATION OF THE EVIDENCE, BY ESTABLISHING THE SENIOR MEMBER'S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PROCESS

XXV. MILITARY JUDGE FAILED TO PROPERLY INSTRUCT THE MEMBERS REGARDING THE LAW OF A CAPITAL CASE AND THE CAPITAL SENTENCING MECHANISM OF R.C.M. 1004 AND 1006, WHEN THE MILITARY JUDGE FAILED TO INFORM THE MEMBERS OF THESE MATTERS IN PRELIMINARY INSTRUCTIONS AND FIRST

EXPLAINED THEM AFTER COUNSEL'S SENTENCING ARGUMENT

XXVI. THE MILITARY JUDGE'S FAILURE TO INSTRUCT THE MEMBERS REGARDING THE BURDEN OF PROOF ON MITIGATING FACTORS WAS INADEQUATE GUIDANCE TO THEM IN THEIR DELIBERATIONS TO ENSURE A RELIABLE SENTENCING VERDICT

XXVII. TRIAL COUNSEL'S SENTENCING ARGUMENT WAS UNDULY PREJUDICIAL

XXVIII. THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING AND MITIGATING CIRCUMSTANCES IS UNCONSTITUTIONAL; THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT"

XXIX. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE MEANING OF THE TERM "SUBSTANTIALLY OUTWEIGHED," WITH REGARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING FACTORS

XXX. FOR ASSURANCE OF MEANINGFUL REVIEW, ANY DEATH PENALTY SENTENCING WORKSHEET MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS FOUND BY THE MEMBERS

XXXI. THE MILITARY JUDGE'S INSTRUCTION THAT "YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING FACTORS" DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS FINDING MUST BE UNANIMOUS

XXXII. THE MILITARY JUDGE ERRED IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINED THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS, EACH MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE

XXXIII. THE MILITARY JUDGE FAILED TO SPECIFICALLY ADVISE THE MEMBERS THAT ONLY A SINGLE VOTE WAS NEEDED TO DEFEAT THE DEATH SENTENCE

XXXIV. R.C.M. 1004 IS UNCONSTITUTIONAL UNDER THE FIFTH AND EIGHTH AMENDMENTS AND VIOLATES ARTICLE 55, U.C.M.J., BY NOT REQUIRING THAT SENTENCING PROCEDURES BE MORE DETAILED AND SPECIFIC TO ALLOW A RATIONAL UNDERSTANDING BY THE MILITARY JUDGE, CONVENING AUTHORITY, AND APPELLATE AUTHORITIES AS TO THE STANDARDS USED BY THE PANEL

XXXV. THE COURT OF CRIMINAL APPEALS HAS A SUPERVISORY ROLE IN ENSURING THAT COUNSEL ARE QUALIFIED IN TRAINING AND EXPERIENCE TO DEFEND A CAPITAL CASE

XXXVI. A FACT–FINDING COURT OF CRIMINAL APPEALS MUST UNANIMOUSLY AGREE ON BOTH FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE AND MUST APPLY THE POLICY OF *IN FAVOREM VITAE*

XXXVII. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY ERRONEOUSLY INSTRUCTING THE MEMBERS THAT THEY WERE TO VOTE ON ANY SENTENCE PROPOSED WHICH HAD DEATH AS A PROPOSED SENTENCE BEFORE ANY PROPOSALS WHICH INCLUDED LIFE AS A PROPOSED SENTENCE, IN VIOLATION OF AIRMAN SIMOY'S DUE PROCESS RIGHTS

XXXVIII. R.C.M. 1004(c)(4)'S USE AS AN AGGRAVATOR WAS IM-PROPERLY AND UNCONSTITUTIONALLY ALLOWED

XXXIX. R.C.M. 1004(c)(8)'S USE AS AN AGGRAVATOR WAS ILLEGAL, UNCONSTITUTIONAL, AND MATERIALLY PREJUDICIAL

XL. THE JUDGE ERRED IN HIS INSTRUCTIONS UNDER R.C.M. 1004 ON WEIGHING THE MITIGATING AND AGGRAVATING CIRCUMSTANCES, AND FAILED IN HIS *SUA SPONTE* DUTY TO CORRECTLY GIVE INSTRUCTIONS, THEREBY VIOLATING AIRMAN SIMOY'S RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS, AND ARTICLE 55, U.C.M.J.

XLI. THE MILITARY JUDGE ERRED IN HIS DENIAL OF APPELLANT'S MOTION TO SUPPRESS SOME STATEMENTS MADE ON 16 JANUARY 1992 AS VIOLATIVE OF MRE 305, THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION

XLII. THE CONVENING AUTHORITY'S APPROVAL OF FORFEITURES OF PAY AND ALLOWANCES IN HIS ACTION OF 22 MARCH 1993 WAS A NULLITY

XLIII. THE MILITARY JUDGE ERRED BY ADMITTING THE STATEMENTS OF NON–TESTIFYING CO–CONSPIRATORS

XLIV. THE CONVENING AUTHORITY WAS DISQUALIFIED FROM ANY POST–TRIAL DUTIES DUE TO HIS VICE COMMANDER'S AND HIS WIFE'S PERSONAL INVOLVEMENT WITH SGT LEVAY'S FAMILY

XLV. THE MILITARY JUDGE ERRED BY ADMITTING TWO DEATH CERTIFICATES OF SERGEANT LEVAY

XLVI. THE MILITARY JUDGE ERRED BY REFUSING TO ADMIT DEFENSE EXHIBIT B, AN OFFICIAL UNITED STATES ARMY REGULATION ABOUT EXECUTIONS AT THE U.S. DISCIPLINARY BARRACKS

XLVII. THE MILITARY JUDGE ERRED BY REFUSING TO GIVE DEFENSE REQUESTED MITIGATION INSTRUCTIONS AND MATERIALLY PREJUDICED AIRMAN SIMOY'S RIGHTS BY ADVISING THE MEMBERS THAT AIRMAN SIMOY HAD AN "APPARENT DESIRE TO ACCEPT RESPONSIBILITY"

XLVIII. THE SJA'S ADVICE IN HIS RECOMMENDATION TO THE CONVENING AUTHORITY WAS PREJUDICIALLY DEFICIENT IN THAT HE FAILED TO ADDRESS THE ISSUE OF SENTENCE COMPARISON

XLIX. THE NUMEROUS ERRORS WHICH OCCURRED DURING AIRMAN SIMOY'S COURT–MARTIAL CANNOT BE FOUND HARMLESS BEYOND A REASONABLE DOUBT WHEN CONSIDERED COLLECTIVELY

L. THE DEATH SENTENCE IS NEITHER APPROPRIATE NOR PROPORTIONATE FOR AIRMAN SIMOY'S CRIMES OR HIS PERSONAL CULPABILITY

LI. (*LOVING* ISSUE 1) WHETHER CONGRESS' LEGISLATIVE RESPONSIBILITY TO ESTABLISH THE AGGRAVATING CIRCUMSTANCES TO BE USED IN MILITARY CAPITAL CASES IS ONE WHICH CAN BE DELEGATED TO THE PRESIDENT CONSISTENT WITH THE SEPARATION OF GOVERNMENTAL POWERS REQUIRED BY ARTICLE I, SECTIONS 1 AND 8 AND THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION

LII. (*LOVING* ISSUE 2). WHETHER CONGRESS HAS IMPLICITLY DELEGATED TO THE PRESIDENT ITS LEGISLATIVE AUTHORITY TO ESTABLISH AGGRAVATING CIRCUMSTANCES TO BE USED IN MILITARY CAPITAL CASES

LIII. (*LOVING* ISSUE 3). IF THERE HAS BEEN SUCH AN IMPLICIT DELEGATION OF AUTHORITY TO THE PRESIDENT, WHETHER CONGRESS HAS ESTABLISHED CONSTITUTIONALLY ADEQUATE STANDARDS TO GUIDE THE PRESIDENT'S EXERCISE OF LEGISLATIVE AUTHORITY